STATEMENT OF THE CASE
The Grand Jury of the First Judicial District of Hinds County indicted George Bell ("Bell") for the murder of Allen Mize ("Mize"). The case was heard before a jury on May 29 and May 30, 1991. The jury found Bell guilty of murder and the court sentenced him to life in prison. Bell, through his attorney, filed a motion for a new trial and a motion for judgment notwithstanding the verdict. The court overruled the motions on June 13, 1991. Aggrieved by his conviction, Bell perfected an appeal to this Court.
 STATEMENT OF FACTS
George Bell worked as a nurse's assistant at Methodist Medical Center at the time of the murder. He worked at the psychiatric unit helping the nurses with the patients. Curtisene Lloyd, a licensed practical nurse employed by Methodist Medical Center, testified that on September 9, 1990, she was assigned to be the charge nurse of the psychiatric unit on Six Southeast. At about 3:00 that afternoon, Allen Mize and another employee arrived to work their shifts. Some ten minutes later, another employee, George Bell, arrived and began to argue with Mize. Apparently, Bell assumed that he, not Mize, was scheduled to work the three-o'clock shift. To settle the matter, Lloyd confirmed with Mrs. Sanders, their supervisor, that Mize was properly on duty at this time. *Page 818 
While waiting for Mrs. Sanders to ascertain whether Bell could be employed at another position in the hospital, the two men renewed their quarrel. Lloyd stated:
 The argument started again. My patients was [sic] at the door, looking in the office where they were arguing, and I asked them if they would please stop because the patients didn't need to see employees carrying on in this fashion. And they did. They obeyed. They slowed down a little bit. They didn't completely stop. And then the argument would get heated again. So at that point I just picked up my medicine cups. I had 3 p.m. meds to give and I only had two. So I said, "Well, I'm going to go next door and give my medicines in the day room," I said, "because the patients don't need to see employees carrying on like this," and I picked up my medicines and walked into the day room.
While in the dayroom, 16 feet from the room in which Mize and Bell were arguing, Lloyd heard the telephone ring. Since no one called her to the telephone, she gave her patients their medications. Thereafter, Bell stated, "Well, you gonna make something of it? Huh?" Mize replied, "George, please, man. Please, no." Lloyd then heard two gunshots in rapid succession.
Lloyd ran to the doorway. Lloyd stated that Mize had fallen in the hallway and was in a crawling type of position. While Bell was standing, holding the gun and pointing it at Mize, Lloyd screamed, "George, my God, what have you done?" Lloyd stated:
 [Mize] jumped up and grabbed me while I was still watching the gun because I couldn't take my eyes off of the gun. He grabbed me by both shoulders in back of me and started backing up, pulling me. He was bleeding all down me. And I was screaming and begging, and . . . [Mize] was begging; he wasn't screaming.
 * * * * * *
 [Bell was] [w]alking up to us, trying to aim around me. He did — well, he did aim around me.
 * * * * * *
 Allen backed into the bathroom still holding me, and I was pleading for him to let me go. I couldn't get — couldn't get loose; he was gripping my shoulders, and I was pleading to Bell not to kill us. I said, "George, please you're going to kill us both. Please don't kill us."
When Mize reached around Lloyd and reached for the door knob, Bell fired another shot. Lloyd felt the sting from it on her leg.[1] By this time Mize had collapsed on Lloyd and caused her to "fall with him, face down on the floor." The back of Mize's head was facing her face. While she and Mize were in this position, Bell stepped over Lloyd's head and fired two shots into Mize's head at pointblank range.
Lloyd stated that while about seven of Lloyd's patients watched in terror, Bell waved the gun. Lloyd pulled herself from underneath Mize's body and called for help. As Lloyd was dialing for help, she testified that Bell put the gun back into the bowling bag and walked past her down the hallway. Upon returning to Mize and failing to find a pulse, Lloyd determined that he was dead.
Lloyd testified that at no time did she observe Allan Mize make any aggressive motion towards Bell. She also testified that at no time did she hear any profanity used by either of them.
Bell's version is quite different. Bell testified that Mize had cursed him repeatedly during the disagreement about who was supposed to work that day; that Mize had grabbed him around the neck, causing Bell to fall; and that he drew his gun while trying to prevent Mize from choking him. Bell stated that as he pulled the gun up, the gun went off. Bell testified that Mize got up and left the office. Bell followed him to the dayroom, where Mize fell to the floor.
Bell could not remember how many shots were fired in the nurses' station. He remembered Lloyd standing in the bathroom and hearing the gun sound and seeing Mize fall to the floor. He did not remember actually pulling the trigger and shooting the gun in the dayroom. After Mize fell to the floor, *Page 819 
Bell turned and backed out. The next thing Bell recalled was driving home on the expressway, but did not remember the intervening events. When Bell arrived home, he told his wife that he thought that he had shot Allen Mize. They went to the Pearl Police Department, where Bell turned himself in and surrendered his pistol. On cross-examination, Bell admitted that Mize was unarmed, and that his claim to have been some six or seven inches from Mize when the gun went off was refuted by the absence of gunpowder burns on Mize's chest.
Dr. Rodrigo Galvez, the pathologist whom performed the autopsy, described the gunshot wounds on Mize's chest and back. He testified that the wound on the right side of the thorax and the wound on the back had no signs of tattooing of gunpowder marks. He stated that this absence established that the shots were fired from a distance greater than eighteen inches. By contrast, the tattooing on the two head wounds — one in the nostril, the other on the left side of the head — confirmed that they were inflicted from a distance shorter than twelve inches and possibly from six or eight inches.
The jury found Bell guilty of murder.
 ASSIGNMENT OF ERRORS
Bell assigns the following as error:
I. WHETHER THE EXCLAMATION OF THE DECEASED'S MOTHER THAT BELL HAD MURDERED HER SON PREJUDICED HIS RIGHT TO A FAIR TRIAL.
II. WHETHER THE VERDICT WAS THE PRODUCT OF BIAS AND PASSION AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
 I.
During the testimony of Curtisene Lloyd, the victim's mother jumped up in the audience and shouted "cold blooded killed my child." Bell asserted that this outburst prejudiced his right to a fair trial. Bell's argument centered around the following excerpt which began during the state's direct examination of Curtisene Lloyd:
 Q. Okay. If you would, describe for the jury exactly how you fell when you hit the floor and where the deceased's head was in relation to where your head fell.
 A. We fell face down to the floor. My face was turned this way. Allen's head was — Allen's face was turned opposite of mine. The back of his head was facing my face. It was about that much difference in between my head and his head. The rest of his body was on me.
 Q. All right. For the record, is that about maybe a foot to fifteen inches between your face and the back of his head?
 A. Right. Uh huh.
 Q. Okay. And then what?
 A. Then George stepped over my head, and reached — Allen's head was like this. He still had his head raised some. George stepped over my head and fired a shot into Allen's head.
 VICTIM'S MOTHER (In the audience): Cold blooded killed my child.
 THE COURT: Just a minute. Just a minute.
 VICTIM'S MOTHER: He cold-blooded killed my child.
 THE COURT: Step into the jury room, please. Mrs. Morgan. Mrs. Morgan. Would you step into the jury room, please.
 (JURY EXCUSED FROM THE COURTROOM. VICTIM'S MOTHER REMOVED FROM THE COURTROOM.)
 THE COURT: Let's give the jury a few minutes.
 (RECESS.)
 (THE FOLLOWING PROCEEDINGS OCCURRED WITH THE JURY REMAINING OUTSIDE THE COURTROOM:)
 * * * * * *
 MR. BARNETT: At this time, if the Court please, comes now the defendant and moves the Court for a mistrial based on the fact that the mother of the deceased was sitting in the front row of the audience here, jumped up a minute ago during the testimony of Curtisene Lloyd and blurted *Page 820 
out in the presence of the jury and everybody that "He killed my son in cold blood" several times and had to be restrained and forcibly taken out of the courtroom. We feel that this is highly prejudicial to his case, and that the jury cannot now fairly deliberate over the facts and testimony, and we would move the court for a mistrial.
 THE COURT: Well, I intend to inquire from the jury if they can eliminate that outburst, the emotional outburst on their consideration. We have, obviously, an intelligent jury, and I will rely on their response to it.
 (JURY RETURNED TO THE COURTROOM.)
 THE COURT: Members of the jury, let me have your attention. In view of the emotional outbreak that I sent you out of the room for, I need to ask each of you to individually if you can set that aside and try the case solely on the evidence presented here and not let that have any bearing on your decision in the case. I want you to give your full consideration and give me a complete and honest answer to that question. Do all of you understand I'm asking can you set that aside and not let it have any bearing on your decision in this case? Let me start over here. Can you do so? Juror No. 1.
After each juror replied in the affirmative — that he or she could disregard the outburst — the following was taken:
 THE COURT: Thank you. Well, I do want to further instruct you that you are not to consider that as evidence in any way, and you are not to let it have any bearing at all in your decision.
 Again, I remind you that it is your duty to try the case solely from the evidence that's presented here from the witness stand and any stipulations that might be entered. Do all of you understand? (ALL JURORS NODDED AFFIRMATIVELY.)
 Thank you. I appreciate it.
Bell argued that the spontaneous exclamation came at an early stage of the trial when the jury was beginning to form an opinion as to the facts of the case. Bell cited no case for the proposition that an outburst such as this was not curable by the court's instructions. Bell argued that this situation should be compared to Fuselier v. State, 468 So.2d 45 (Miss. 1985).Fuselier is distinguishable from the case sub judice, because in Fuselier the victim's daughter sat at the counsel table with the prosecutor after having testified. In the case sub judice,
the victim's mother made her exclamation from the audience and was immediately escorted from the courtroom; thereafter, the court properly admonished the jury to disregard the incident.
Any harm flowing from the woman's outburst was removed by the trial judge's proficient handling of the matter. The judge suasponte ordered the jury out of the courtroom immediately after the remarks were made. Once order was restored to the courtroom, the judge questioned the jury to determine if each could disregard the comments.[2] This Court has held that it must be presumed that the jurors followed the court's admonition to disregard the unanticipated, unprovoked incident and to decide the case solely on the evidence presented; to presume otherwise would be to render the jury system inoperable. See Wright v.State, 540 So.2d 1, 4 (Miss. 1989); Hunt v. State,538 So.2d 422, 426 (Miss. 1989); Johnson v. State, 475 So.2d 1136, 1142 (Miss. 1985). Accordingly, this assignment of error is without merit.
 II.
After having considered Bell's second assignment of error, this Court finds it to be without merit. Ample evidence existed to support the jury verdict of guilty.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THECUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. *Page 821 
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
[1] Lloyd sustained 24 gunpowder burns to her right leg.
[2] The trial judge later cautioned the spectators to refrain from such "emotional outbreaks" during the trial. The court also directed the bailiffs to speak to other members of the victim's family and to ensure that there would be no more outbursts. The victim's mother was not allowed to return to the courtroom.