970 So.2d 178 (2007)
Chico CRAFT, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02187-COA.
Court of Appeals of Mississippi.
July 24, 2007.
Rehearing Denied November 20, 2007.
*180 William R. Labarre, Virginia Lynn Watkins, attorneys for appellant.
Office of the Attorney General by W. Daniel Hinchcliff, attorney for appellee.
Before MYERS, P.J., CHANDLER and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Chico Craft was convicted of murder and was sentenced to serve a term of life in the custody of the Mississippi Department of Corrections. On appeal, Craft argues that: (1) the jury was improperly instructed on the element of deliberate design, (2) there was insufficient evidence of deliberate design, and (3) a spectator's emotional outburst warranted a mistrial. We find no error and affirm.

FACTS
¶ 2. Taiwaneshia McElroy and Craft were romantically involved and had been living together for two years. They had plans to marry and raise a family. On the night of July 10, 2004, they entertained another couple with dinner and cards. After the couple left, McElroy and Craft argued over the card game. The argument ended without incident, and they both went to sleep.
¶ 3. The next morning, July 11, 2004, McElroy went to work. She returned at about 11:00 a.m., woke up Craft, and went into the dining room. Craft followed McElroy and tried to talk to her, but she was silent. She walked toward the couch in the living room and Craft followed. Another argument ensued. McElroy told Craft she did not love him anymore. She demanded that Craft return the key he had to her apartment. McElroy told Craft that she wanted him to move out of the apartment by the time she returned. Craft told her that he loved her and wanted to be with her. He refused to give her the key. Finally, Craft told McElroy that he would need time to get his stuff out.
¶ 4. During this argument, a physical altercation occurred. McElroy began hitting and pushing Craft in an effort to get the key. He held her and tried to calm her down. The two wrestled. She pushed him against the dining room window, and it broke. He pushed her down on the couch and began hitting her. He grabbed a kitchen knife, left over from dinner the previous night, from the nearby table. Craft began stabbing McElroy. She made her way to the sliding glass window, where Craft slit her throat. He tried to help her back on the couch but left her lying next to it. The fight occurred in several rooms, ranging from the kitchen, dining room, to the living room.
¶ 5. Craft put his shoes on and left for his sister's home. He threw the knife out of the car on State Street, but it was never recovered. He picked up his niece and nephew and took them to his mother's house. He returned to his sister's home and went to sleep. At 3:30 a.m., Craft returned to McElroy's apartment to check on her. He then went back to his sister's *181 house. At about 6:00 a.m., he told his sister what happened and called the police.
¶ 6. Craft cooperated with the police and exhibited a sense of shock and remorse for the killing. He consistently maintained that his actions were a result of his rage at the time. At trial, the only issue in dispute was Craft's state of mind prior to the killing. Forensic pathologist Dr. Stephen Hayne testified that McElroy's injuries were:
scrapes and scratches of the skin at multiple sites of the body, including the forehead, the left cheek, the left chin, also the upper chest, the left inguinal area and the groin area on the left side of the body and also extensively over the right and left upper extremities, including the right forearm as well as the back of the right arm and forearm, also over the left elbow and also over the front of the left arm and forearm. In addition to that, there was a cut located over the forehead that measured approximately one-and-a-half inches. There was a small cut located over the left chin, a smaller size. In addition to those, there were a total of six stab wounds: [o]ne stab wound located over the left cheek that measured approximately seven-eighths of an inch on the skin surface. It was nonlethal. It went into a depth of approximately one inch. . . .
There were also two stab wounds located to the front surface of the right . . . arm [and] right forearm. Again, they were superficial extending to a depth of approximately an inch and were nonlethal.
There were three stab wounds located on the back of the right arm. . . . parallel to each other. They measured up to approximately an inch-and-a-half on the skin surface, went to a depth of approximately one inch into the arm, and those, again, were nonlethal.
There was one lethal injury . . . and that was a slash wound . . . located going across the neck for a distance of seven-and-one-half inches. It went to a depth of approximately three inches. [This severed her] right common carotid artery . . . right jugular vein. . . . [and] trachea. . . . Those were the lethal injuries. . . .
¶ 7. The jury convicted Craft of murder.

ANALYSIS
I. Was the jury properly instructed on the element of deliberate design?
¶ 8. Craft argues that two jury instructions on deliberate design were in hopeless conflict. Craft claims that the instructions allowed the jury to find murder without intent. The State responds that Craft waived the issue. In the alternative, the State asserts the two instructions are in agreement.
¶ 9. Instruction 7 (also identified as D-6A) read:
The Court instructs the Jury that the term "deliberate design," as used in these instructions, means intent to kill, formed before the moment of the act of killing took place, without authority of law and not legally justifiable, excusable, or under any circumstances that would reduce the act to a lesser crime. Deliberate design under this definition cannot be formed at the time of the act that produces the death of another.
The word "deliberate" always indicates a full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate.
Therefore, if you find from the evidence and testimony presented that Chico Craft did not have a deliberate design or intent to kill Taiwaneshia McElroy at *182 some time before the act of killing took place, then it is your sworn duty to find Chico Craft "Not Guilty" of murder.
(emphasis added). Instruction 8 (also identified as S-3) read:
The Court instructs the jury that the "deliberate design to effect death" referenced elsewhere in these instructions does not have to exist in the mind of the slayer for any given length of time; and that such element of the crime of murder is satisfied if you find beyond a reasonable doubt that the defendant formed such design at any time before the commission of the act which caused the death of the decedent and continued to have such design at the time of the commission of such act, if any.
(emphasis added).
¶ 10. We begin our review by noting that Craft did not object to Instructions 7 or 8 at trial. In fact, Craft submitted Instruction 7 to the trial court. "Appellant has no standing to seek redress from an alleged error of his own creation." Evans v. State, 547 So.2d 38, 40 (Miss. 1989). Craft, by offering Instruction 7, got exactly what he asked for and he "cannot now complain that his request was granted." Smith v. State, 877 So.2d 369, 390(¶ 62) (Miss.2004); Blackwell v. State, 915 So.2d 453, 455(¶ 7) (Miss.Ct.App.2005).
¶ 11. Procedural bar notwithstanding, we conclude that the jury instructions were not in conflict and did not preclude a finding of manslaughter. In reviewing the grant or refusal of a jury instruction, we read all the jury instructions actually given as a whole. Fears v. State, 779 So.2d 1125, 1127(¶ 9) (Miss. 2000). If the instructions as a whole fairly announce the law and create no injustice, no reversible error will be found. Id.
¶ 12. In Windham v. State, 520 So.2d 123, 126 (Miss.1987), the Mississippi Supreme Court found that an instruction that deliberate design can exist "at the moment of" the killing negates a finding of heat of passion manslaughter. The jury, in Windham, was instructed on both deliberate design murder and heat of passion manslaughter. Id. at 125. The murder instruction charged that even if deliberate design did not arise until "at the very moment of the fatal beating," this was sufficient for a finding of murder. Id. The court reversed the trial court and held that:
"deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate. . . . While it is no doubt true that a deliberate design to kill . . . may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act.
Id. at 126. If the killing occurs during a heat of passion, the crime is manslaughter. Id. at 127. Therefore, the court found that the murder instruction "ruled out" the instruction on manslaughter. Id. at 126.
¶ 13. In Theodore v. State, 798 So.2d 465, 470(¶ 21) (Miss.2001), the supreme court distinguished Windham. In Theodore, the murder instruction read, "[a] deliberate design cannot be formed at the very moment of the fatal act, however, the deliberate design need not exist . . . for any definite time . . . but if . . . it exists . . . but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of Murder." Id. Because the instruction specifically stated that deliberate design "cannot be formed at the very moment of the fatal act," there was no confusion. Id. at (¶ 22).
*183 ¶ 14. Craft argues that the language "at any time before" in Instruction 8 leaves room for the jury to conclude that deliberate design could occur at the time of the fatal act. We disagree. Instruction 7 properly tracts the language in Windham and defines the element of deliberate design. The jury was also specifically told that deliberate design could not be formed at the same time as the fatal act. The jury instructions were properly submitted to the jury. Therefore, we find that this issue has no merit.
II. Was the verdict supported by sufficient evidence of intent?
¶ 15. Craft argues there was insufficient evidence to support his murder conviction. Specifically, he challenges the lack of evidence of deliberate design. The State responds that the use of a deadly weapon was sufficient evidence upon which to infer deliberate design to kill McElroy.
¶ 16. In reviewing a sufficiency of the evidence claim, the Court considers the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844 (¶ 16) (Miss.2005). Usually, if any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we will uphold the verdict. Id.
¶ 17. Deliberate design murder consists of "[t]he killing of a human being without the authority of law by any means or in any manner . . . when done with deliberate design to effect the death of the person killed, or of any human being." Miss.Code. Ann. § 97-3-19(1)(a) (Rev. 2006). As previously discussed, "`deliberate' always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. `Design' means to calculate, plan, contemplate." Windham, 520 So.2d at 126. Deliberate design "connotes a prior design to kill. Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before [committing the fatal act]." Blanks v. State, 542 So.2d 222, 226-27 (Miss.1989). Deliberate design may be inferred from the circumstances, such as the use of a deadly weapon. Coffield v. State, 749 So.2d 215, 217-18(¶ 10) (Miss.Ct.App.1999).
¶ 18. The fatal act in this case was Craft slashing McElroy's throat with a knife. Did Craft have the deliberate, premeditated intent to kill McElroy before he slashed her throat? The jury found that he did. We conclude that this point presents a classic jury question between deliberate design and heat of passion.
¶ 19. There was certainly evidence to support a finding of heat of passion manslaughter. Craft and McElroy were engaged in an impromptu, emotional fight. It was violent, as evinced when McElroy shoved Craft so hard into the window, it burst. Craft's shirt was torn, and he had a scratch on his face. McElroy's various wounds appeared to be random, rather than calculated. Craft exhibited both shock and remorse. Craft testified he grabbed the knife out of a fit of anger and "cut her." He described the fight up to the point of grabbing the knife, while she was on the couch. The next thing he consistently described is cutting her by the window. He never described the actual stabbing and slashing.
¶ 20. There was likewise sufficient evidence to support a finding of deliberate design. After he knocked her on the couch, Craft went to the nearby table to retrieve the knife. He returned to the couch and stabbed her. Besides a total of six stab wounds, McElroy sustained many *184 other cuts and abrasions, indicating that they struggled at some point while he had the knife. The jury could have concluded that McElroy tried to get away at least twice, after he started stabbing her. There was a bloody handprint and swipe on the floor by the front door in the living room. Craft finally slashed her throat after she moved to the sliding glass window on the other side of the living room. He left her in the apartment for approximately fifteen hours, before he returned to the scene. He waited an additional two and a half hours before calling police.
¶ 21. We find that there was sufficient evidence for the jury to find that, before Craft slashed McElroy's throat, he had appreciable time to plan, and did in fact plan, to kill her. We find no error on this issue.
III. Was Craft entitled to a mistrial after a spectator's emotional outburst at trial?
¶ 22. Craft argues the trial court should have granted a mistrial after a spectator's emotional outburst disrupted trial. The State responds that the issue was waived. In the alternative, the State claims there was no prejudice.
¶ 23. An emotional outburst occurred during the playing of the 911 tape. While the transcript did not record the outburst, it was enough for the trial court sua sponte to order:
THE COURT: All right. Let's turn it off.
MS. PETERSON [District Attorney]: May we take a brief recess, your Honor[?]
THE COURT: Members of the jury, I need you to step into the jury room, please.
(Jury excused from the courtroom.)
THE COURT: [911 operator witness] may step down.
(Recess. The jury remained outside the courtroom during the following proceedings:)
MS. WALL [Defense Counsel]: Your Honor, at this point we would ask the Court for a mistrial because of the outburst. We feel that it was prejudicial to my client and the jury is affected by that and we move for a mistrial.
THE COURT: All right. Be overruled. In the Court's opinion there was no outburst at all. The Court observed a spectator during the portion of the tape being played put his hands to his ears for about one minute and then when the Court ascertained or heard audible moaning, that's when I immediately sent the jury out and declared a recess. So it will be overruled at this point.
Ms. Peterson, you need to make sure that although we have a public courtroom there are certain rules of decorum that are going to be observed.
MS. PETERSON: Yes, your Honor. We have done so.
Trial resumed, and the 911 tape continued to play. No special instructions were requested or given to the jury.
¶ 24. The standard of review for a denial of a motion for mistrial is abuse of discretion. Caston v. State, 823 So.2d 473, 492(¶ 54) (Miss.2002). "Upon motion of a party or its own motion, the court may declare a mistrial if [ ] the trial cannot proceed in conformity with law." URCCC 3.12. The most fundamental and sacred rights secured for the criminal defendant is his right to a trial before a fair and impartial jury. Johnson v. State, 476 So.2d 1195, 1209 (Miss.1985). "Because of this, once the jury is empaneled, all cautionary measures possible should be taken to prevent extraneous or outside influence *185 from reaching the jury in an effort to ensure impartiality and to ensure that the accused receives a fair trial." Williamson v. State, 512 So.2d 868, 882 (Miss.1987) (overruled on other grounds). Outside influences must be eliminated if possible and minimized otherwise or the verdict rendered is questionable and a mistrial is appropriate. Fuselier v. State, 468 So.2d 45, 53 (Miss.1985).
¶ 25. For example, in Fuselier it was reversible error when the victim's daughter sat inside the rail near the prosecutor's table and "exhibited emotion" while acting as both a spectator and a witness. Id. The trial court overruled Fuselier's objections. Id. at 52-53. The victim's daughter's actions gave the false impression of the prosecution acting on behalf of the victim. Id. "Because such an erroneous view can all too easily lead to a verdict based on venge[a]nce and sympathy as opposed to reasoned application of rules of law to the facts" this was error. Id.
¶ 26. The supreme court revisited the issue of emotional outbursts in Jones v. State, 841 So.2d 115 (Miss.2003). Jones was on trial for the stabbing death of Michael Wilkerson. Id. at 121(¶ 4). During Dr. Hayne's testimony, several of Wilkerson's family left the courtroom crying loudly. Id. at 140(¶ 84). The judge sent the jury out and admonished the spectators to be quiet. Id. He did not give a curative instruction, as none was requested. Id. He banned the disruptive spectators from the remainder of the trial. Id. The supreme court noted that "the trial judge is in a better position to assess the effect of such an incident than is this Court . . . and this Court will not reverse . . . unless a trial judge abused his discretion." Id. at (¶ 85) (quoting Chase v. State, 645 So.2d 829, 848-49 (Miss.1994)). "It is only when it is evident that such authority should be exercised and is not, that this Court will interfere." Id. (quoting Floyd v. State, 166 Miss. 15, 40, 148 So. 226, 232 (1933)). Because the trial court immediately restored order and no other outburst occurred, the supreme court affirmed the denial of a mistrial. Id. at (¶ 86).
¶ 27. Likewise, in Bell v. State, 631 So.2d 817 (Miss.1994), the supreme court affirmed denial of a mistrial. Bell was on trial for murder. During eyewitness testimony, the victim's mother jumped up in the front row and "blurted out" several times, "Cold blooded killed my child. He cold-blooded killed my child." Id. at 819. She had to be restrained and forcibly removed from the courtroom. Id. at 820. The trial court immediately sent out the jury. Id. at 819. He then polled the jury members to determine whether they could set aside the "emotional outbreak" and render a verdict solely on the evidence from the witness stand. Id. at 820. All jurors indicated they could. Id. He instructed them they were not to consider the outburst as evidence in any way and were not to let it have any bearing on their decision. Id. The Bell court distinguished Fuselier in that the victim's mother was not at counsel's table and the trial judge proficiently handled the matter. Id.
¶ 28. As in Bell and Jones, here, the trial court immediately sent the jury out and restored order to the courtroom. There was no further outburst. The trial court obviously did not think that the spectator's moaning was yet prejudicial. It appears the trial court took prompt preventative action. In this regard, this case may be distinguished from Fuselier, where the trial court took no preventative or curative action whatsoever. Further, we note that Craft did not feel the need to request a curative instruction after denial of the mistrial.
¶ 29. Besides the emotional impact on the jury, one concern may be whether or *186 not the spectator's actions interfered with the jury's ability to hear the 911 tape. It was a key piece of evidence on Craft's state of mind, and Craft's voice on the tape is very soft with intermittent crying. However, there is no indication from the record that the jury could not hear the tape. The only concern from the trial court and the attorneys was the emotional nature of the outburst.
¶ 30. The trial court was in the better position to assess the impact of the moaning and found a recess was all that was warranted. On this record, we find no error.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.