# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01763-COA

**WILLIE HEARNS, III**                                                   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                 **APPELLEE**

DATE OF JUDGMENT:              11/14/2019
TRIAL JUDGE:                   HON. LINDA F. COLEMAN
COURT FROM WHICH APPEALED:     COAHOMA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: ZAKIA HELEN ANNYCE BUTLER
DISTRICT ATTORNEY:             BRENDA FAY MITCHELL
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 03/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.

## WILSON, P.J., FOR THE COURT:

¶1.     Willie Hearns shot Elex "Skeeter" Wilson six times, killing him, while the two men were seated in Wilson's car at the Nosef Apartments in Clarksdale. Hearns initially denied that he was involved in the shooting but then changed his story and claimed that he killed Wilson in self-defense. Hearns was indicted for first-degree murder and convicted after a jury trial. On appeal, Hearns argues that the State argued facts not in evidence during closing arguments, that the trial judge gave an erroneous jury instruction regarding deliberate design, and that his trial counsel provided ineffective assistance by requesting a jury instruction that

undermined his claim of self-defense.  We find no reversible error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.    On the morning of April 1, 2018, Captain Ricky Bridges of the Clarksdale Police Department responded to a report of shots fired at the Nosef Apartments in Clarksdale. When Bridges arrived, Wilson was in the driver's seat of his car and had been shot multiple times.  Chantel Wiliams was cradling Wilson's head and trying to get him to speak.  By the time emergency medical personnel arrived, Wilson had died.

¶3.    The police found seven spent 9-millimeter shell casings nearby on the street.  Inside Wilson's car, they found an unspent .32-caliber round that had been under or beside Wilson's leg.  One bullet was found embedded in the driver's seat of Wilson's car.

¶4.    Wiliams lived in an apartment building within sight of where Wilson's car was parked.  Earlier that morning, she saw Wilson sitting in his car with another man.  The car's windows were tinted, and the man was wearing a hooded sweatshirt with the hood up, so Wiliams could not provide a detailed description of him.  Later, while Wiliams was still in her apartment, she heard a series of gunshots and rushed outside to grab her son and bring him back inside.  After ensuring her son's safety, Wiliams went back outside and saw a man wearing a hooded sweatshirt running away from the apartment complex.  She then ran to Wilson's car and tried to keep him awake until an ambulance arrived.  Wilson died while Wiliams was trying to help him.

¶5.    Troy Kimble, the Assistant Chief of Police for the Clarksdale Police Department,

questioned Hearns about Wilson's death. Hearns signed a *Miranda*[1] waiver, and Kimble recorded the interview. Hearns first denied having anything to do with Wilson's death, but after further questioning, he admitted that he killed Wilson. Hearns stated that he and Wilson had been arguing about money. According to Hearns, Wilson stated that he would not repay a debt he owed to Hearns. Hearns claimed that Wilson then "upped" a pistol at him. Hearns stated that he was afraid for his life. Hearns claimed that he grabbed one of Wilson's guns and shot Wilson while trying to get out of the car.[2] Hearns then ran to a friend's house. On the way, he threw away the gun he had used to shoot Wilson. Hearns's cousin drove him to Tunica, and Hearns then drove his cousin's car to Arkansas. Sometime later, he returned to Clarksdale. A Coahoma County grand jury indicted Hearns for first-degree murder.

¶6. Dr. Mark LeVaughn, Chief Medical Examiner for the State, performed the autopsy and testified at trial. LeVaughn testified that Wilson died of multiple gunshot wounds. Wilson was shot six times—once in the front right shoulder/armpit, twice in the chest, twice in the abdomen, and once in the back of his left hand. All were "distant" wounds, meaning that the barrel of the gun was more than three feet away from Wilson when fired. LeVaughn testified regarding the path of each of the six bullets, but he did not opine regarding the order in which the shots were fired or Wilson's body position at the time of the shooting. LeVaughn testified that in a shooting death, the victim's hands are routinely tested for

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Although Hearns claimed that Wilson pointed a gun at him and that there was a "pile" of guns in Wilson's car, the police did not find any guns during their search of the car and surrounding area. The police were also unable to recover the gun that Hearns had used to shoot Wilson.

gunshot residue (GSR). LeVaughn "believe[d]" that specimens had been obtained from Wilson's hands, but his records did not indicate the results of any GSR test.[3]

¶7. Shannon Roy, a forensic scientist at the Mississippi Forensics Laboratory, testified that Hearns's palm print was found on the passenger door of Wilson's car. Starks Hathcock, a forensic scientist and ballistics expert at the Mississippi Forensics Laboratory, testified that all of the spent shell casings recovered from the crime scene were fired from the same gun. He also testified that the unspent .32-caliber round found in Wilson's car could not be used in a 9-millimeter pistol.[4]

¶8. During the State's closing argument, one of the prosecutors argued that "[w]e know" that the "first shot" fired by Hearns struck Wilson in the shoulder and armpit. The prosecutor further argued that this "mean[t] . . . that [Wilson's] arm [was] down" when he was shot. Hearns objected, arguing that there was no evidence or testimony from LeVaughn that Wilson was first shot in the shoulder. The judge stated that she would "let the instructions cover" the issue, and she specifically referenced the instruction that the jury should disregard arguments of counsel that had no basis in the evidence. The prosecutor then continued by arguing that the "[f]irst shot [went] through [Wilson's] arm, so his arm [was] down and in front of him" and was "not pointed . . . at the passenger door."

¶9. The trial judge instructed the jury on first-degree murder, self-defense, imperfect self-

---

[3] Kimble testified that Wilson's hands had been "bagged" at the crime scene in order to preserve evidence on his hands, but nothing in the autopsy photographs or LeVaughn's records indicated that Wilson's hands had been bagged.

[4] The .32-caliber round was missing. Apparently it was lost after Hathcock analyzed it.

defense manslaughter, and heat-of-passion manslaughter.  The jury found Hearns guilty of first-degree murder, and the trial judge sentenced Hearns to life imprisonment.  Hearns filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.  On appeal, he argues that (1) the State improperly argued facts not in evidence, (2) the trial judge gave an erroneous jury instruction regarding deliberate design, and (3) his trial counsel provided ineffective assistance by requesting a jury instruction that undermined his claim of self-defense.

## ANALYSIS

### I.     Closing Argument

¶10.    An improper closing argument by the State will require a new trial if "the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016) (quoting *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013)).  Prosecutors "are allowed a wide latitude in arguing their cases to the jury" but may not make arguments that "are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000).  "The prosecutor may comment upon any facts introduced into evidence, and he may draw . . . deductions and inferences that seem proper to him from the facts." *Wilson*, 194 So. 3d at 864 (¶30) (quoting *Galloway*, 122 So. 3d at 643 (¶72)).  But the prosecutor may not state facts that are not in evidence.  *Id.*

¶11.    "Arguing statements of fact which are not in evidence or necessarily inferable from

5

facts in evidence is error when those statements are prejudicial." *Jackson v. State*, 174 So. 3d 232, 237 (¶12) (Miss. 2015) (quoting *Ross v. State*, 954 So. 2d 968, 1002 (¶74) (Miss. 2007)). Here, the prosecutor asserted in his closing that "[w]e know" that the first shot fired by Hearns struck Wilson in the shoulder and armpit. He then argued that this "mean[t]" that Hearns must have shot Wilson while Wilson's "arm [was] down and in front of him." However, no evidence was presented at trial regarding the order of Wilson's bullet wounds. LeVaughn described each wound and the path of each bullet, but he did not opine that the bullets were fired in any particular order.[5] In addition, Hearns did not testify, there were no other eyewitnesses to the shooting, and there is nothing else in evidence to suggest which bullet was fired first. Accordingly, we agree with Hearns that the State argued facts that were "not in evidence or necessarily inferable from facts in evidence." *Id.*

¶12.    However, not every improper comment rises to the level of reversible error. *See Randall v. State*, 806 So. 2d 185, 212 (¶67) (Miss. 2001) ("Although error, the question of whether the comment constitutes reversible error is a separate and distinct question."). Reversal is required only when "the natural and probable effect of the improper argument of the prosecuting attorney is to create [such] an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Id.* (quoting *Dancer v. State*, 721 So. 2d 583, 590 (¶34) (Miss. 1998)).

¶13.    In *Randall*, the prosecutor stated in closing that a witness "all of a sudden, didn't have gunshot residue on his hands," but there was no evidence before the jury that the witness was

---

    [5] On a diagram, LeVaughn labeled the wounds alphabetically, but he stated that the ordering had "nothing to do with the order of any of the injuries."

6

ever tested for residue or that such test was negative. *Id.* at 213 (¶70). The Supreme Court concluded that the State's comment was error but that jury instructions cured the error. *Id.* at 213-14 (¶¶70-73). Prior to closing arguments, the trial judge had instructed the jury that "[a]rguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence" and that if an attorney's "recollection of the evidence differs from what your recollection is, you must follow your own recollection." *Id.* at 213 (¶72). The Supreme Court reasoned that because the jury was so instructed, and because the judge instructed the prosecutor to "move on" after defense counsel objected, the improper comment did not require reversal. *Id.* at (¶73); *see also Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992) (stating that "although the court overruled the objection, it did admonish the jury that the comments were only argument and not evidence," and thus reversal was not warranted).

¶14. We reach the same conclusion in this case. As in *Randall*, the jurors in this case were instructed that the attorneys' arguments were not evidence and that the jurors were required to rely on their own recollection of the evidence, not the attorneys' arguments. Indeed, the relevant jury instructions in this case were nearly identical to those given in *Randall*. We conclude that the prosecutor's "isolated comment" regarding the order of the gunshots was cured by the jury instructions and "did not create an unjust prejudice against [Hearns] so as to result in a decision influenced by the prejudice so created." *Randall*, 806 So. 2d at 214 (¶73). Therefore, the comment does not require reversal.

## II. Deliberate Design Jury Instructions

¶15.    When we review the giving or refusal of jury instructions, "the instructions actually given must be read as a whole." *Theodore v. State*, 798 So. 2d 465, 469 (¶16) (Miss. 2001). "When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.*

¶16.    Hearns argues that the trial judge erred by giving Jury Instruction No. 8 (S-3), which stated,

> The Court instructs the jury that the "deliberate design to effect death" referenced elsewhere in these instructions does not have to exist in the mind of the slayer for any given length of time; and that such element of the crime of murder is satisfied if you find beyond a reasonable doubt that the defendant formed such design at any time before the commission of the act which caused the death of the decedent and continued to have such design at the time of the commission of such act, if any.

In his brief on appeal, Hearns argues that this instruction "was confusing and misleading, argumentative and an improper comment on the sufficiency and weight of the evidence."

¶17.    However, at trial Hearns only objected to the instruction "as being repetitious" and because it did not expressly state that deliberate design cannot be formed "at the moment of the fatal act." The trial judge addressed the latter issue by granting Hearns's proposed instruction D-2 (Jury Instruction No. 9), which stated,

> The Court instructs the jury that "deliberate design" as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. *However, a "deliberate design" cannot be formed at the very moment of the fatal act.*

(Emphasis added).

8

¶18. Thus, Hearns's argument on appeal differs substantially from his objections at trial. It is well-settled that "asserting grounds for an objection on appeal that differs from the ground given for the objection at trial does not properly preserve the objection for appellate review." *Montana v. State*, 822 So. 2d 954, 959 (¶12) (Miss. 2002). Therefore, Hearns's appellate argument is procedurally barred, at least in part.

¶19. Hearns's argument is also without merit. Jury Instruction No. 8 correctly stated that "deliberate design" must be "formed . . . *before* the commission of the [fatal] act." (Emphasis added). In addition, Jury Instruction No. 9 then stated specifically that "'deliberate design' cannot be formed at the very moment of the fatal act." In *Craft v. State*, 970 So. 2d 178, 181-83 (¶¶8-14) (Miss. Ct. App. 2007), we held that substantially similar instructions were not confusing and properly instructed the jury on the concept of deliberate design. We explained that the instructions were consistent with and fairly instructed the jury on the Mississippi Supreme Court's holdings that "deliberate design *cannot* be formed at the very moment of the fatal act" but may be formed "but for an instant before the fatal act." *Id.* at 182 (¶13) (quoting *Theodore*, 798 So. 2d at 470 (¶21)); *see also Ashmore v. State*, 302 So. 3d 707, 714 (¶19) (Miss. Ct. App. 2020) (noting that this Court "previously approved of [substantially similar] instructions in *Craft*"). The instructions given in this case are consistent with our decision in *Craft* and Mississippi Supreme Court precedent, they fairly instructed the jury on the applicable law, and they did not comment on the weight of the evidence. Accordingly, the trial judge did not err by giving Jury Instruction No. 8.

### III. Ineffective Assistance of Counsel

¶20. The defendant's constitutional "right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). A claim of ineffective assistance of counsel may be asserted on direct appeal if the defendant is represented by appellate counsel who did not represent him at trial. *Ellis v. State*, 281 So. 3d 1092, 1099 (¶20) (Miss. Ct. App. 2019). "Generally," however, such "claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (brackets omitted). "This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* (other brackets and quotation marks omitted). In addition, we may address such "claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id.*

¶21. To prevail on a claim of ineffective assistance, the defendant must show *both* (1) "that counsel's performance was deficient"—i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—*and* (2) that he was prejudiced as a result—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The defendant "bears the burden of proving both prongs of *Strickland*." *Ravencraft v. State*, 989 So. 2d 437, 443 (¶31) (Miss. Ct. App. 2008). "If either prong is not met, the claim fails." *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶22. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Branch v. State*, 882 So. 2d 36, 52 (¶26) (Miss. 2004) ("Trial counsel is presumed competent, and the burden of proving that counsel's performance was deficient and prejudicial falls upon the Appellant."). Therefore, "the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted).

¶23. Hearns argues that his trial counsel provided constitutionally ineffective assistance by requesting Jury Instruction No. 10, which stated:

> The Defendant in this is asserting the defense of self-defense. The Court instructs the Jury that to make the shooting of another person justifiable on the grounds of self-defense, the danger to the Defendant must either be actual, present, and urgent, or the Defendant must have reasonable grounds to believe that the alleged victim intended to kill the defendant or to do him some great bodily harm; and in addition to this, the Defendant must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the Jury to determine the reasonableness of the grounds upon which the Defendant acted.
>
> In addition, one who claims self-defense may not have used excessive force to repel the attack, but may only use such force as is reasonably necessary under the circumstances. If you find from the evidence, beyond a reasonable doubt, that the Defendant, Willie Hearns, shot and killed Elex Wilson, and that said shooting was a use of more force than was reasonably necessary under the circumstances of this case, then the defense of self-defense would not apply in this case.

Hearns argues that this instruction undermined his claim of self-defense by stating that the defense "would not apply" if Hearns used "more force than was reasonably necessary under the circumstances." Hearns argues that this was an incorrect statement of the law and

11

prejudiced his defense.

¶24.    We disagree.  Hearns is correct that the Mississippi Supreme Court "has condemned outright the granting of any instruction that precludes a defendant from asserting a claim of self-defense." *Boston v. State*, 234 So. 3d 1231, 1234 (¶10) (Miss. 2017) (quoting *Johnson v. State*, 908 So. 2d 758, 762 (¶15) (Miss. 2005)).  But Jury Instruction No. 10 did not cut off Hearns's right to claim self-defense.  Rather, the instruction correctly stated the law.  This Court has previously approved of nearly identical instructions.  *See Duke v. State*, 146 So. 3d 401, 405 n.2 (Miss. Ct. App. 2014) (stating that a nearly identical jury instruction "properly instructed on self-defense"); *Franklin v. State*, 72 So. 3d 1129, 1143 (¶61) (Miss. Ct. App. 2011) (finding no error in a nearly identical jury instruction); *Ellis v. State*, 956 So. 2d 1008, 1014 (¶12) (Miss. Ct. App. 2007) (holding that a nearly identical instruction "adequately apprised the jurors of both the law as it pertains to self-defense and that [the defendant] was entitled to this defense if the evidence supported such a claim").  In addition, our Supreme Court has "held that a person may not use more force tha[n] reasonably appears necessary to save his life or protect himself from great bodily harm." *Griffin v. State*, 495 So. 2d 1352, 1354 (Miss. 1986) (quoting *Stennis v. State*, 234 So. 2d 611, 614 (Miss. 1970)); *see also Tate v. State*, 784 So. 2d 208, 212 (¶16) (Miss. 2001) ("Whether the force used by an individual in defending himself was reasonable or unreasonable is a fact issue to be decided by the jury."); *Hall v. State*, 644 So. 2d 1223, 1229-30 (Miss. 1994) (holding that "whether [the defendant] used excessive force in repelling the attack on him" was an "issue[] for the jury to decide").

¶25. In summary, Jury Instruction No. 10 correctly states the law. Hearns cites no case disapproving a similar instruction or any other authority to the contrary. Hearns's trial counsel did not provide ineffective assistance by requesting an instruction that fairly stated the law on Hearns's theory of defense. Accordingly, this issue is also without merit.

## CONCLUSION

¶26. Although the State argued facts not in evidence during its closing argument, the prosecutor's isolated comments were addressed by the court's instructions to the jury and do not require a new trial. In addition, the jury was properly instructed on the concept of deliberate design, and Hearns's trial counsel did not provide ineffective assistance by requesting a fair and correct jury instruction on Hearns's claim of self-defense.

¶27. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**