# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01586-COA

**RONALD BENJAMIN CLEMENTS A/K/A**                                              **APPELLANT**
**RONALD CLEMENTS A/K/A RONALD B.**
**CLEMENTS A/K/A BEN CLEMENTS**

**v.**

**STATE OF MISSISSIPPI**                                                               **APPELLEE**

DATE OF JUDGMENT:               10/07/2016
TRIAL JUDGE:                    HON. JAMES LAMAR ROBERTS JR.
COURT FROM WHICH APPEALED:      PRENTISS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         ROBERT SNEED LAHER
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: ABBIE E. KOONCE
DISTRICT ATTORNEY:              J. TRENT KELLY
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED: 12/12/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.

### GRIFFIS, P.J., FOR THE COURT:

¶1.     Ronald Clements was convicted of child fondling and sentenced to serve fifteen years in the custody of the Mississippi Department of Corrections, with seven years suspended, followed by five years of post-release supervision. He was ordered to pay all court costs, a fine in the amount of $1,000, $200 to the Prentiss County Sheriff's Department Investigative Fund, $1,000 to the Mississippi Children's Trust Fund, and $100 to the Mississippi Crime Victim's Compensation Fund. Clements was further ordered to register as a sex offender and to have no contact with the child or the child's family.

¶2. Clements did not file any post-trial motions. Nevertheless, he appeals his conviction and challenges the sufficiency and weight of the evidence. We find these issues are procedurally barred and without merit. Accordingly, we affirm.

FACTS AND PROCEDURAL HISTORY

¶3. Clements was indicted on one count of child fondling. Specifically, the indictment charged Clements as follows:

> [O]n or about or between the dates of October 1, 2012[,] and December 1, 2012, [Clements] did wilfully, unlawfully[,] and feloniously, being a person above the age of 18 years, for purpose of gratifying his lust or indulging his depraved, licentious sexual desires, handle, touch[,] and/or rub, with his hands or other parts of his body, [Sara Gates,[1]] a child under . . . 16 years of age, her birth date being September 16, 2006, with or without her consent, in violation of Mississippi Code Annotated, Section 97-5-23 . . . .

¶4. At trial, the State called six witnesses. Linda Pickering, Sara's mother, was the first to testify. Pickering testified that Sara's date of birth was September 16, 2006, and that Sara was six years old and in kindergarten in the fall of 2012.

¶5. Pickering further testified that in the fall of 2012, she was living with Clements and her two children. At that time, Pickering worked at the Chevron from 1 p.m. to 11 p.m. Sara and her brother would go to their grandmother's house after school, and Clements would pick them up three to four times a week. Pickering stated Clements was alone with the children nearly every night.

¶6. Pickering explained that on Christmas Eve 2012, she overheard her nephew, Charlie, say to Sara, "last night after we had sex." Pickering called her sister and subsequently took

_____

[1] For privacy purposes, we substitute fictitious names for the minor children and their parents.

2

the children to her sister's house to find out what was going on. Charlie advised that he learned of sex from Sara. When Pickering asked Sara to explain, Sara responded that she could not tell because her daddy would get mad. Upon further questioning, Sara told Pickering that "daddy made [her] kiss his wee-wee." When asked if she meant Clements, Sara stated yes.

¶7. Pickering testified that when she asked Sara if Clements had hurt her, Sara responded, no, "he just used the tickly thing." Sara described the tickly thing as "the thing behind the clothes in the drawer." Pickering advised that the "tickly thing" was a vibrator that was kept in a drawer under some clothes. Pickering further advised that she and Clements were the only ones who knew where the vibrator was kept.

¶8. Pickering immediately reported the allegations to the sheriff's department and was instructed to wait until after the holidays to speak to the Department of Human Services (DHS). On December 26, 2012, Pickering took Sara to DHS, where Sara was interviewed outside of Pickering's presence. Pickering further took Sara for a forensic interview and got Sara into therapy.

¶9. Pickering testified that she believed her daughter and that Sara's story never changed. Importantly, Pickering testified that Sara never advised that anyone other than Clements touched her.

¶10. Candace Scott, Pickering's sister, testified that her son, Charlie, was "about three months older than [Sara]." Scott stated that she, along with her husband and Pickering, talked to Charlie about what Pickering had overheard him say to Sara. Charlie advised that

3

Sara "showed him how to have sex the night before" and that they "pulled their clothes down and touched each other and kissed." When asked if she ever questioned Charlie again about what had happened with Sara, Scott responded, "[a] few times, but it was always [Sara] showed him, so the story never changed." Scott explained that according to Charlie, it only happened that one time.

¶11.    Detective Derrick Hester, a criminal investigator with the Prentiss County Sheriff's Department, testified that on December 24, 2012, he received a sexual-abuse complaint from Pickering regarding Sara. He subsequently met with Pickering on December 26th, during which Pickering reported that Clements, her boyfriend, had fondled and molested her child. Detective Hester contacted DHS to create a safety plan and to set up a forensic interview.

¶12.    Detective Hester was not present for the forensic interview, but reviewed the audio and video recordings as part of his investigation. Detective Hester subsequently had a warrant issued for Clements and contacted him directly. Clements met with Detective Hester at his office where Clements was interviewed and arrested.

¶13.    Joanna Wilbanks, a family protection specialist with the Prentiss County DHS, who handles child-sexual-abuse cases, met with Pickering and Sara following the receipt of a report on December 26, 2012. During the meeting, Sara disclosed, without being asked, that "her dad made her suck down there" and pointed to her private area. When Wilbanks asked Sara who her dad was, Sara responded that it was Clements.

¶14.    Additionally, when Wilbanks asked Sara if anyone had told her what to say, Sara stated that her mother told her to tell the truth. In her report, Wilbanks stated as follows:

4

Found the allegations in the report to be substantiated. [Sara] has disclosed that her mother's boyfriend, [Clements], made her suck down there and pointed to her private area. [Sara] stated that she was scared to say what down there was. [Sara] did state that her dad told her not to tell anybody. Forensic interview will be documented and post narrative once received.

¶15. Marie Frison, the director of the Child Advocacy Center in Tupelo, was admitted as an expert "in forensic interviewing and in dealing with sexually abused children." Frison conducted a forensic interview of Sara on January 2, 2013. The forensic interview included anatomy identification where an age appropriate female and male drawing was used. According to Frison, Sara referred to a girl's private area as her "private place" and the boy's private area as his "private place" or "wee-wee."

¶16. Frison testified that Sara disclosed sexual abuse by Clements and did not say anyone else abused her other than Clements. The synopsis of Frison's forensic interview with Sara was admitted into evidence and read to the jury. The synopsis stated as follows:

> [Sara] reports that she lives with her mother and brother. [Sara] said her mother is nice because she lets her color on everything and mean because she whoops her all the time. [Sara] said her father lives in a different home and he is mean because he did something down there, pointing to [her] vaginal area. [Sara] reported that her father touched her vagina with his hand. [Sara] said her clothes were down to her knees and he touched her on the outside of her body. [Sara] also reports that her father made her touch his penis with her hand and rub up and down. [Sara] said her father's penis was hairy and big. [Sara] said his clothes were pulled down as well. [Sara] said this happened in her mother's bed. [Sara] reports that this happened more than one time. [Sara] also reports seeing her father with his clothes down and white stuff coming out of his penis. [Sara] stated he was shaking it too much. [Sara] described him rubbing white stuff into the carpet. [Sara] also said that her father made her lick his penis and kiss it.

¶17. Frison opined that the results of Sara's interview were consistent with that of a child who had been sexually abused. Frison explained that Sara was able to provide who was

involved, what sexual act occurred, where the abuse occurred, and when it occurred. Additionally, Sara's statements were consistent, verbal, and explained using anatomical drawings. Frison testified there were no red flags that indicated Sara might have been coached into making the disclosure.

¶18. Sara was the State's last witness. Sara testified that when she was in kindergarten, she lived with her mom, her brother, and Clements, whom she considered to be her "daddy." Sara stated that in October or November 2012, Clements touched her in her private place. When asked where her private place was, Sara pointed to her vaginal area.

¶19. Sara explained that while her mother was at work, Clements took her into her mother's bedroom, told her to get into the bed, and to pull down her pants. Sara stated Clements then got in the bed, pulled down his pants, and asked her to touch his "middle," which she later identified as his "wiener." Sara stated that when she touched Clements's wiener, she felt hair. Additionally, Sara stated that she kissed Clements's wiener "[b]ecause he told [her] to." Sara agreed that Clements touched her in her private area and had her touch him.

¶20. Sara further explained that on a separate occasion, while in the living room, Clements pulled down his pants, got a vibrator out of the drawer, and rubbed it against his penis, as Sara watched. Sara explained that while Clements was doing this, she saw "white stuff" come out of his penis. Sara described Clements's penis as "really bumpy" with brown hair.

¶21. When asked why she did not tell her mother what had happened, Sara replied, "[b]ecause [Clements] told me not to." However, Sara testified that she eventually told her

6

mother what had happened after her mother overheard her talking about it with her cousin.

¶22.   On cross-examination, Sara acknowledged that she and her cousin talked about sex, but stated that she had never touched her cousin, nor had her cousin ever touched her. Moreover, Sara stated that no one other than Clements had ever touched her in her private area.

¶23.   Following the presentation of its witnesses, the State rested its case-in-chief. The circuit court recessed for the evening and allowed defense counsel and Clements time "to get ready if they had motions in this matter." The next morning, the circuit court asked if there were any motions on behalf of Clements. Defense counsel responded that Clements did not have any motions "at th[at] time," but wished to proceed with the presentation of his case.

¶24.   Clements called various witnesses in support of his defense, including Pickering and Leah Headings. Pickering testified that her relationship with Clements continued until April 2013. Pickering described her continued relationship with Clements as stupid and not the smartest decision. Pickering emphasized that she always believed Sara and did everything she could do to protect her.

¶25.   Additionally, Pickering testified that there had been "a couple" of other incidences between Sara and Charlie. Specifically, Pickering stated that she "caught them kissing."

¶26.   Headings, who is a licensed clinical social worker, testified regarding her counseling sessions with Sara. Headings advised that because Sara had already disclosed sexual abuse, her focus "was . . . more to help [Sara] to process and deal with her abuse and heal from it."

¶27.   According to Headings, Sara advised that Clements "touched [her] down there" and

7

asked her to touch his "willy." When asked why she told her mom on Christmas Eve, Sara responded, "[s]he just told me to do it. She saw us in the closet with our pants down." Headings clarified that Sara was talking about her cousin Charlie. Headings emphasized that this was the first time she had met with Sara and that Sara was "blurting all this out" since there were different things to discuss, both about Clements and Charlie.

¶28.    Headings explained that when she first met with Sara, she believed Sara was having anxiety over being abused, which would explain why she skipped around from topic to topic. Importantly, Headings testified that she believed Sara was molested by Clements.

¶29.    Clements testified in his own defense. He stated his relationship with Sara was a normal one between a father and a daughter. Clements denied the allegations and stated he never touched Sara inappropriately and never asked her to touch him. Clements explained that while he did not think Sara made up the allegations, he believed she accused the wrong person. Clements stated that "something else ha[d] happened" that had "not been discovered." Clements further testified that his date of birth was June 15, 1988, and that he was twenty-four years old in October and November 2012.

¶30.    Following the presentation of his witnesses, Clements rested. The State did not call any rebuttal witnesses and finally rested. After the jury was excused, the circuit court asked defense counsel if there were any motions for the record. Defense counsel responded, "I don't believe so."

¶31.    The record does not indicate any post-trial motions were filed by Clements following his conviction. Instead, Clements filed a notice of appeal within thirty days of the judgment.

On appeal, Clements claims: (1) the evidence was insufficient to support his conviction, and (2) the verdict was against the overwhelming weight of the evidence.

ANALYSIS

*I.*    *Waiver*

¶32.    Although Clements challenges the sufficiency and weight of the evidence against him, we must first determine whether he waived these issues.

¶33.    Absent a renewal of the directed-verdict motion, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict (JNOV), an appellant has waived the sufficiency error on appeal. *Darnell v. State*, 202 So. 3d 281, 285 (¶13) (Miss. Ct. App. 2016). Additionally, "[t]he matter of evidentiary weight is waived by the failure to move for a new trial." *Stewart v. State*, 879 So. 2d 1089, 1095 (¶24) (Miss. Ct. App. 2004) (citation omitted).

¶34.    The record shows that Clements did not move for a directed verdict at any point during trial. The record further shows Clements did not request a peremptory instruction or file any post-trial motions for a JNOV or a new trial. Consequently, Clements has waived his right to challenge the sufficiency and weight of the evidence against him.

¶35.    Notwithstanding the procedural bar, we find Clements's claims are without merit.

*II.*    *Sufficiency of the Evidence*

¶36.    Clements first argues "[t]here was insufficient evidence to sustain the jury verdict against [him]." In considering whether the evidence is sufficient to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State*, 35 So. 3d 480, 485 (¶16) (Miss. 2010) (citations omitted). Where the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is to reverse and render. *Id*. However, if "reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient. *Id*.

¶37. Clements was convicted of child fondling in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2015). The elements of child fondling are: (1) a handling, touching, or rubbing, (2) of a child under the age of sixteen years, (3) by a person above the age of eighteen years, (4) for the purpose of gratifying lust or indulging depraved, licentious sexual desires. Miss. Code Ann. § 97-5-23(1).

¶38. Here, the record shows that at the time the acts occurred, Clements was twenty-four years old and Sara was six years old. Sara testified that Clements touched her in her "private area" and made her touch and kiss his penis. Sara described Clements's penis and further described an incident wherein "white stuff" came out of his penis.

¶39. Our Supreme Court has held that

> the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence, especially if the conduct of the victim is consistent with the conduct of one who has been victimized by a sex crime.

*Collier v. State*, 711 So. 2d 458, 462 (¶15) (Miss. 1998) (disagreed with on other grounds by

10

*Dilworth v. State*, 909 So. 2d 731, 735 n.4 (Miss. 2005)). Sara's testimony was corroborated by her mother and aunt. Additionally, Sara's testimony was consistent with the information she previously provided to various child-advocate professionals. Wilbanks, Frison, and Headings all found Sara's claims were credible. Moreover, Frison opined that the results of Sara's forensic interview were consistent with that of a child who had been sexually abused. Accordingly, we find sufficient evidence was presented to support Clement's conviction.

¶40.    Despite the testimony presented, Clements asserts the evidence was insufficient for various reasons. We address each separately.

¶41.    First, Clements claims there was "no medical and/or scientific evidence upon which to sustain the verdict." However, no such evidence is required. Nevertheless, the record shows forensic evidence was presented in support of the allegations. Specifically, Frison conducted a forensic interview of Sara, which included anatomical drawings and identification. Frison's report was admitted into evidence and read to the jury.

¶42.    Clements next claims "there was no evidence that [he] ever admitted the allegation to law enforcement or otherwise." While Clements did not admit the allegations against him, he offered nothing to dispute Sara's claims other than general denials. Moreover, Sara's testimony regarding the allegations against Clements was corroborated by several witnesses, including Headings, a defense witness.

¶43.    Clements further claims "[t]he record appears to be void of any actual proof of [his] age." Yet Clements himself testified that his date of birth was June 15, 1988, and that he was twenty-four years old in October and November 2012. Thus, at the time of the allegations

11

set forth in the indictment, Clements was "above the age of 18 years."

¶44. Additionally, Clements asserts it is "evident from the record" that Sara and her cousin had "sexual contact" and that Sara's testimony was inconsistent on this issue. Although the record indicates that Sara and Charlie "touched each other and kissed," Sara affirmatively stated that no one ever touched her in her private area other than Clements. Importantly, Wilbanks, Frison, and Headings, who were all aware of Charlie's involvement, believed that Sara had been sexually abused by Clements. Thus, despite any "sexual contact" with Charlie, the evidence supports Sara's allegations against Clements.

¶45. Next, Clements asserts that Pickering's continued communication with him indicates that she did not believe Sara. However, Pickering testified that she believed her daughter. Although Pickering continued to talk to Clements following the allegations, the record shows she never again allowed Sara to be around Clements.

¶46. Clements last asserts that Sara did not initially accuse him during the trial, but did so only after being prompted by the State. However, the record shows Sara specifically stated at the beginning of her testimony that Clements touched her in her private place. Sara consistently identified Clements as the one who touched her and made her touch him.

¶47. Overall, considering the evidence in the light most favorable to the State, we find sufficient evidence exists to support Clements's conviction of child fondling. Accordingly, this issue is meritless.

### III. Weight of the Evidence

¶48. Clements argues "the verdict of the jury . . . was against the overwhelming weight of

the evidence." He claims "[n]o reasonable jury possibly could have concluded beyond a reasonable doubt that [he] committed the crimes alleged in the indictment."

¶49. "When reviewing a denial of a motion for [a] new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Birge v. State*, 216 So. 3d 1174, 1178 (¶17) (Miss. Ct. App. 2017). "The evidence is weighed in the light most favorable to the verdict." *Id*.

¶50. Here, the jury heard from both Sara and Clements, and was therefore presented with both sides of the story. "[T]he jury acts as fact-finder and must determine the credibility of the witnesses, and the proper weight to be assigned to their testimony." *Winding v. State*, 908 So. 2d 163, 168 (¶20) (Miss. Ct. App. 2005) (citations omitted). Any conflicts in the evidence are for the jury to resolve. *Williams v. State*, 64 So. 3d 1029, 1033 (¶13) (Miss. Ct. App. 2011) (citation omitted).

¶51. Having considered the evidence presented, we do not find the verdict to be so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice. Thus, we find this issue lacks merit.

CONCLUSION

¶52. We find the issues raised on appeal were waived by Clements's failure to move for a directed verdict, his failure to seek a peremptory instruction, and his failure to file a post-trial motion for a judgment notwithstanding the verdict or a new trial. Nevertheless, we find sufficient evidence to support Clement's conviction and do not find the verdict to be so

13

contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Accordingly, we affirm the circuit court's judgment.

¶53. **AFFIRMED**.

**LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**