# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00546-SCT

*LAWRENCE L. MORRIS, III a/k/a LAWRENCE
LORINZO MORRIS, III a/k/a LAWRENCE
LORENZO MORRIS, III a/k/a LAWRENCE
MORRIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/21/2023 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| TRIAL COURT ATTORNEYS: | STEVEN SIMEON KILGORE |
| | LESLIE R. BROWN |
| | CHRISTOPHER MORGAN POSEY |
| | MITCHELL DEE THOMAS |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ZAKIA BUTLER CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON HORNE |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Lawrence Morris was accused of raping his younger sister's best friend and was subsequently indicted, tried (twice), and found guilty on one count of statutory rape. He appeals his conviction, claiming the jury's verdict was against the sufficiency of and the overwhelming weight of the evidence. We affirm the conviction.

## FACTS AND PROCEDURAL HISTORY

¶2.    On July 7, 2019, Taylor[1] and her younger brother went to visit their dad at the Morris family home.  Taylor's family and the Morrises were close family friends.  The two families interacted almost daily and had done so long before Taylor was born.  The Morrises' daughter Nekiya and Taylor were the same age and best friends.  At the time of Taylor's visit, Taylor's dad was living at the Morris house after separating from Taylor's mother.

¶3.    Throughout the day of the alleged incident, Taylor indicated multiple times that she wanted to go home.  Taylor would often get homesick during her visits and call her mom crying and ask to be picked up.  Taylor's mother did not come to pick Taylor up from the Morrises' house despite her repeated requests.

¶4.    Later that night, Taylor, her younger brother, and all the Morris children hung out in Nekiya's room playing a video game.  According to Taylor, she dozed off across the head of the bed, lying next to her brother and Nekiya.  The other three children and Lawrence Morris were on the floor around the bed.  While she was asleep, Taylor claimed she felt like "something" was inside of her and was "just like moving."  Taylor claimed that she woke up because she "felt weird," like "something was off," and that Morris, then seventeen years old, was next to her on her side.

¶5.    Taylor also reported that her leggings were down when she moved the covers back, but she had not felt anyone messing with them while she was asleep. Taylor testified that she pulled her leggings back on, got up from the bed, and went to the bathroom, where she called

---

[1]Because the victim in this case is a minor, we use a pseudonym to protect her identity.

her mother to come and pick her up. While in the bathroom, Taylor pulled her pants back down and discovered she was bleeding. She "cleaned [her]self up as best [she] could. Taylor did not say anything to anyone in the house during or after the purported incident.

¶6. In response to Taylor's report about the alleged incident, her mother immediately came to pick up Taylor. Taylor and her mother left the Morris home and went to Taylor's grandmother's house, where they called the police and an ambulance. The responding officer and Taylor's older sister Breaunna both described Taylor as "hysterical," and the medical responders noted Taylor was in "emotional stress." Breaunna and their mother followed the ambulance to the hospital. The ambulance took her to a local emergency room (ER), where a nurse performed a sexual assault exam. Taylor did not shower before going to the hospital and arrived in the same clothes she had on at the Morris house.

¶7. The ER nurse, Jessica Reynolds, testified that she noted one small rectal tear during Taylor's exam. The nurse could not confirm the injury was a result of sexual contact or abuse, though she documented "sexual abuse [was] highly suspected." The nurse noted some minor bleeding from the site at the time of the exam, but the bleeding was not substantial such that blood transferred onto Taylor's underwear or other clothing. The ER nurse also recounted that she took five photos during Taylor's exam, but she did not know what happened to the pictures by the time this matter went to trial, so no photographs were admitted into evidence.

¶8. Swabs from Taylor's rectum, vagina, and mouth were collected and sent to the crime lab for testing. The Mississippi Forensics Lab tested Taylor's sexual assault kit and all the

3

clothing she was wearing the night of the alleged incident. Morris's DNA was also collected and sent to the lab for testing. All the items tested negative for the presence of seminal fluid or sperm cells. Blood was only found on Taylor's rectal swab, not in her underwear or on any of the other clothing items.

¶9.    Nekiya, Taylor's best friend, was one of the four other people awake and in the room at the time of the purported incident. She testified about what she observed that night. Nekiya was in bed with Taylor and recalled Taylor being awake on her phone all night, either texting or talking. Nekiya also recalled that Taylor tried to go home multiple times throughout the day because she had gotten homesick. When Taylor got up to go to the bathroom, Nekiya stated that Taylor was gone for about thirty minutes, and when she returned to the room, she put her shoes on and walked outside without saying anything; Taylor did not appear to be upset and was not crying when she left the room. Nekiya said she saw "nothing out of the ordinary" between Taylor and Morris, but she admitted that the lights were off in the room and that she had been watching the video game.

¶10.    Morris was not at home much of the day in question and denied having any physical involvement with Taylor on that night or at any other time. Prior to this report, Taylor visited the Morris home often, more times than she could count without incident, and Taylor's father continued to live with the Morris family after the alleged incident.

¶11.    Morris took the stand at trial and testified that he would not have, nor had he ever had, any physical involvement with Taylor. He stated that he would not be physically involved with Taylor because "she was under age, and she was [his] sister's best friend." Further,

4

Morris said he had never had a bad interaction with Taylor prior to the alleged incident, and he had not had an interaction with her since because he had been away for college. Taylor never complained to Morris on the day in question about pain in her rectum.

¶12.    A Newton County grand jury indicted Morris for statutory rape under Mississippi Code Section 97-3-65(1)(b) (Supp. 2019) for "willfully, unlawfully, and feloniously hav[ing] sexual intercourse with . . . a child under the age of fourteen (14) years[.]" Morris was convicted by the trial jury as charged. The trial court sentenced Morris to eight years, five suspended, three to serve, in the custody of the Mississippi Department of Corrections, followed by five years of supervised probation. The trial court also sentenced Morris to pay a fine and court costs and to register as a sex offender upon his release. Morris was tried twice for this offense; his first trial resulted in a mistrial due to a hung jury. The same jury instructions were given in both trials. At the conclusion of his second trial, Morris moved for a judgment notwithstanding the verdict or for a new trial, which the trial court denied. Morris appeals.

## DISCUSSION

¶13.    On appeal, Morris's only assignments of error are that his conviction for statutory rape is against the sufficiency of and overwhelming weight of the evidence presented.

¶14.    "When determining whether the evidence is legally sufficient to sustain the verdict, we must consider the evidence in the light most favorable to the State." *Sumrall v. State*, 758 So. 2d 1091, 1095 (Miss. Ct. App. 2000) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)). "The credible evidence consistent with guilt must be accepted as true." *Id.*

(citing *McClain*, 625 So. 2d at 778).  "The State must be given the benefit of all favorable inferences that may be drawn from the evidence." *Id.* (citing *McClain*, 625 So. 2d at 778).  "We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.* (citing *McClain*, 625 So. 2d at 778).  "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole v. State*, 46 So. 3d 290, 293–94 (Miss. 2010).  "Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* at 294. We must reverse and render only if, "on any element of the crime, it is impossible to say that a reasonable person could have found that the State proved that element." *Id.*  Otherwise, the Court must affirm. *Id.*

I.      *The evidence was sufficient to support Morris's conviction for statutory rape.*

¶15.    Morris was indicted for "willfully, unlawfully and feloniously hav[ing] sexual intercourse with [Taylor], a child under the age of fourteen (14) years, at a time when the said Lawrence Lorenzo Morris[] III was twenty-four (24) or more months older than the said [Taylor], and not the spouse of the said [Taylor]," under Mississippi Code Section 97-3-65(1)(b).  Sexual intercourse is defined in the statute as follows:

> (7) For the purposes of this section, "sexual intercourse" shall mean *a joining of the sexual organs of a male and female human being in which the penis of the male is inserted into the vagina of the female or the penetration of the sexual organs of a male or female human being in which the penis or an object is inserted* into the genitals, anus or perineum of a male or female.

Miss. Code Ann. § 97-3-65(7) (Supp. 2019) (emphasis added).

6

¶16. The Court must determine whether the record contains sufficient evidence that supports a reasonable juror's decision that the State met its burden of proof in showing that Morris penetrated Taylor's rectum with his penis or another object. The other elements were not contested.

¶17. Morris argues on appeal that the State failed to offer any evidence of what, if anything, was inserted into Taylor's rectum. Even taking Taylor's account as true, he asserts, the fact that Taylor "felt something" is not enough to satisfy the statute—she could not recount any details of the alleged incident; thus, he argues, the evidence was insufficient. In support of his argument, Morris relies on *Pittman v. State*, 836 So. 2d 779, 784–87 (Miss. Ct. App. 2002).

¶18. In response, the State posits that it presented sufficient evidence for reasonable, fair-minded jurors to find Morris had sexual intercourse with Taylor. The State highlights Taylor's testimony describing the encounter and also points to the evidence that Taylor received immediate medical attention and presented to the emergency room with a "fresh" anal tear and bleeding. The sexual assault nurse examiner "highly suspected" sexual abuse and testified that Taylor's tear was not something "you would normally expect to observe on an 11 year old."

¶19. Morris's reliance on *Pittman* is inapt in part. First, *Pittman* relied on a previous version of Section 97-3-65 that defined sexual intercourse narrowly—"'Sexual intercourse' is defined as 'a joining of the sexual organs of a male and female human being in which the penis of the male is inserted into the vagina of the female.'" *Pittman*, 836 So. 2d at 784

(quoting Miss. Code Ann. § 97-3-65(5) (Rev. 2000)). At the time of the crime, the statute defined statutory rape more broadly by permitting penetration by "penis or an object . . . inserted into the genitals, anus or perineum of a male or female." Miss. Code Ann. § 97-3-65(7) (Supp. 2019). Second, the victim in *Pittman* explicitly testified that no penile penetration ever occurred, though other sexual acts constituting sexual battery did. *Pittman*, 936 So. 2d at 784–85. Because the statute at that time only accounted for penile penetration, evidence related to digital penetration was not enough. Further, testimony from the child victim and a physician at trial regarding an anal tear was not enough to convict of statutory rape, and the jury was not instructed "that penetration need not be proved if it was shown that the genitals, anus or perineum was torn." *Id.* at 786 (citing Miss. Code Ann. § 97-3-65(4) (Rev. 2000)).

¶20. The State argues that, unlike *Pittman*, it could prove sexual intercourse here by showing that Morris's penis or an "object" was inserted into Taylor's anus. The State points to Taylor's testimony that Morris was behind her, stuck "something" "in" her butt, and that it was "inside" of her moving. In the State's view, a reasonable juror could therefore conclude that Morris inserted his penis or an object into Taylor's anus, committing statutory rape.

¶21. This Court's opinion in *Poole*, 46 So. 3d at 293–94, is instructive. We have held that "[a]n individual may be found guilty of rape on the uncorroborated testimony of the prosecuting witness, where the testimony is not discredited or contradicted by other credible evidence." *Id.* at 294 (internal quotation marks omitted) (quoting *Parramore v. State*, 5 So.

8

3d 1074, 1077–78 (Miss. 2009)). In *Poole*, the defendant was charged with two counts of statutory rape. *Id.* at 293. On appeal, this Court affirmed the conviction, finding that sufficient evidence existed to find the defendant guilty and that the verdict was not against the weight of the evidence. *Id.* at 297. To determine whether the evidence was sufficient, the court analyzed the testimony presented to the jury. *Id.* at 294–96. At trial, the victim and her mother provided extensive testimony regarding the abuse. *Id.* at 293. The jury heard this evidence, specifically:

> Jane [the victim] testified on direct examination:
>
> Q:      And what would he do with his penis?
>
> A.      At first he would just put the tip in.
>
> Q.      He would put the tip in your vagina?
>
> A.      Yeah.
>
> Q.      Did he ever do more than that?
>
> A.      Yes. Eventually, he would put it in all the way.

*Id.* at 294.

¶22.    On appeal, Poole argued that Jane's testimony was contradicted at trial by the physician's testimony. *Id.* "In *Killingsworth v. State*, we warned that '[w]hile it is true that a conviction for rape may rest on the uncorroborated testimony of the person raped, that testimony should always be scrutinized with caution.'" *Poole*, 46 So. 3d at 295 (quoting *Killingsworth v. State*, 374 So. 2d 221, 223 (Miss. 1979)). After scrutinizing the victim's

testimony, this Court determined her testimony was sufficient to establish the element of penetration/sexual intercourse; thus, there was no reversible error. ***Id.***

¶23.  Turning to the facts of this case, we will proceed through a similar analysis. We start by looking at Taylor's testimony, then we turn to the other witnesses' testimony, and we conclude by scrutinizing Taylor's testimony.

> *A.  Taylor's Testimony*

¶24.  The jury heard the following relevant testimony from Taylor:

> Q.  Now, going back to that night, there's six of you in this room. Tell us what happened that night.
>
> A.  All I can remember was we were playing the game, and my brother was asleep. And then I got tired, and I said I was fixing to go to sleep. So I gave Nekiya the controller, and then I was going to sleep. And then when I woke up, Lawrence was on the side of me.
>
> . . . .
>
> Q.  And then you fell asleep?
>
> A.  Yes, sir.
>
> Q.  Once you—what caused you to wake up?
>
> A.  I just felt like—I just felt weird, and then I woke up. And then Lawrence was on the side of me, and then he tried to—he moved and then he played like he was asleep, but then I felt like something was off. So I moved the cover off of me, then my pants were down. I pulled my pants up, and I went to the bathroom.
>
> Q.  When you woke up, how close was Lawrence to you?
>
> A.  He was—he was close, like, really close.
>
> Q.  Was he touching you?

A.     Yes, sir.

Q.     Where was he touching you?

A.     He was touching, like, my—behind me.

. . . .

Q.     Was he doing anything to make you hurt?

A.     Yes, sir.

Q.     Tell us about that.

A.     He was behind me, and then I just felt like I was hurting. And then I was wondering why I was hurting, but then I just seen my pants were down. I pulled them up, then I went to the bathroom. And then I pulled my pants down, and then I was bleeding. And then I cleaned myself up as best I could, and I called my mom.

Q.     Where were you hurting?

A.     My butt.

Q.     Where were you bleeding from?

A.     My butt.

. . . .

Q.     At any point did Mr. Morris stick anything in your butt?

A.     Yes, sir.

Q.     Tell us about that.

A.     When I was asleep, I felt like weird, and then I was—I was asleep. The way I sleep, I sleep hard, and it's hard for me to wake up. And then I just felt like something was inside of me, then I was just like moving. And then I eventually woke up, and then he just moved and acted like nothing happened.

11

Q. When you fell asleep, were your pants down?

A. No, sir.

. . . .

Q. You're certain it was Lawrence Morris—

A. Yes, sir.

Q. —that was touching you?

A. Yes, sir.

. . . .

Q. You testified—you said as you were waking, it felt like something inside of you. Inside of you where?

A. Inside of my body.

Q. Okay. In your mouth or in your butt or where?

A. In my butt.

¶25. Taylor further testified about going to the emergency room, speaking with law enforcement, and returning to school.

B. *Corroborating and Contradictory Testimony*

¶26. The State called Taylor's sister Breaunna, Law Enforcement Officer Richard Goode, and Nurse Jessica Reynolds as its supporting witnesses. The Defense called forensic expert Lindsay Nomichith, Morris's sister Nekiya, and Morris himself as its supporting witnesses.

¶27. Taylor's sister Breaunna corroborated Taylor's testimony and version of events. Breaunna recalled details of Taylor's physical appearance at the hospital—"She was bleeding. She was actually torn, like, you can see it with your eyes . . . [o]n her anal area."

Breaunna also described Taylor's post-incident behavior as nothing like how she was before—"[Taylor] was always friendly, laughing, playing, dancing . . . [n]ow she's secluded."

¶28. The State also called Jessica Reynolds, the ER nurse who performed Taylor's rape kit. Nurse Reynolds testified:

> Q. What were the complaints that you were trying to treat?
>
> A. She had reported that she was at her friend's house, and she woke up to her friend's 16 year old brother anally penetrating her. And she had reported that she had been fondled on her butt and that she had pain and bleeding.
>
> Q. Where did she have pain?
>
> A. She reported pain in her rectum.
>
> Q. Where was bleeding reported?
>
> A. It was in her rectum.
>
> . . . .
>
> Q. Okay. In the actual swabbing process, were you able to observe any of the bleeding that had been described?
>
> A. Yes.
> . . . .
>
> Q. And where was that bleeding coming from?
>
> A. There was a tear on her rectum at the 12:00 position when she was prone.

¶29. Nurse Reynolds noted that her documentation reflected that "sexual abuse [was] highly suspected," but there was not "definite evidence of sexual abuse or sexual contact."

13

Reynolds affirmed that the anal tear on Taylor is not something you would normally expect to find on an eleven-year-old.

¶30.  Defense counsel called forensic expert Lindsay Nomichith, employed by the Mississippi Forensics Laboratory in Meridian, Mississippi.  Nomichith testified that she tested the following items from Taylor's rape kit: fingernail scrapings, dried secretion swabs, oral skin contact swabs, vulvar and rectal swabs, perineum swabs, a bra, a shirt, a pair of pants, and underwear.  Based on the tests, there was no seminal fluid or blood found in Taylor's underwear.  She testified that the rectal swabs were positive for blood, and that the presence of semen would not be expected unless the perpetrator had ejaculated.

¶31.  Finally, the Defense called Morris to the stand.  Morris testified that he had never had any physical involvement with Taylor nor would he want to be physically involved with her. Morris stated that Taylor never complained to him at any point about pain in her butt or anything along those lines.  Counsel did not elicit much from Morris during his examination.

### C.  Scrutiny of Testimony

¶32.  Taylor's version of events was presented to the jury and was corroborated by her sister Breaunna and Nurse Reynolds.  None of the testimony from the other witnesses contradicted any part of Taylor's story.  After scrutinizing the testimony and looking at the evidence put forth, a reasonable juror could have reached the decision that the State met its burden of proof to show that Morris penetrated Taylor's rectum with his penis or another object.  Thus, we affirm.

### II.  *The jury's verdict was not against the overwhelming weight of the evidence.*

¶33. Morris next argues his conviction is against the overwhelming weight of the evidence for six reasons: (1) Taylor was homesick and looking for a way to get her mother to come pick her up; (2) four other people were awake in the room during the assault, so Morris could not have committed the crime without anyone noticing; (3) Taylor was awake, moving freely around the room and then disappeared for thirty minutes; (4) Taylor's sexual assault examination was "inconclusive at best"; (5) Taylor's swabs neither detected seminal fluid nor Morris's DNA; and (6) there were multiple inconsistencies between medical records and the testimony provided at trial.

¶34. The State contends that Taylor expressly denied falsely accusing Morris to go home, and testimony of witnesses acknowledged that Taylor was often homesick, but she had never told such drastic stories in the past. The State declares that, despite the presence of others in the room, the lights were off, and those in the room were distracted by the television, which left an opportunity for the crime to take place. Lastly, the State professes that the fact that Taylor's swabs did not detect seminal fluid or Morris's DNA is inconsequential. The forensic expert who tested these swabs indicated that seminal fluid would not be detected unless the perpetrator ejaculated. The State argues that the DNA was not "found" because Morris's DNA sample was not submitted in an "acceptable" condition, meaning that it could not be subject to testing.

¶35. "In determining an issue of whether the weight of the evidence supports a verdict," this Court "will only disturb a verdict if the verdict is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable

15

injustice." ***Hunt v. State***, 81 So. 3d 1141, 1146 (Miss. 2011) (citing ***Ivy v. State***, 949 So. 2d 748, 753 (Miss. 2007)). "[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict." ***Poole***, 46 So. 3d at 297 (quoting ***Bush v. State***, 895 So. 2d 836, 844 (Miss. 2005), *abrogated on other grounds by* ***Little v. State***, 233 So. 3d 288 (Miss. 2017)).

¶36. During the trial, the jury was presented with testimony from both the victim and Morris. Both witnesses were cross-examined, and the jury was able to hear from both parties involved in the alleged incident. Further, the jury heard testimony from Taylor's sister, the ER nurse, the reporting officer, the forensic expert, and Morris's sister. The jury was able to examine all available evidence regarding the circumstances of the alleged rape.

¶37. "Issues of fact and credibility are the primary responsibility of the trier of fact. Accordingly, this Court should not reweigh the facts nor substitute its judgment for that of the fact finder as to credibility issues." ***McFadden v. Miss. State Bd. of Med. Licensure***, 735 So. 2d 145, 152 (Miss. 1999). The jury had the opportunity to weigh the credibility of the witnesses, and their decision to believe Taylor's version of events and deem her more credible cannot be reweighed by this Court. "Any conflicts in the evidence are for the jury to resolve." ***Clements v. State***, 237 So. 3d 175, 183 (Miss. Ct. App. 2017) (citing ***Williams v. State***, 64 So. 3d 1029, 1033 (Miss. Ct. App. 2011)). Thus, we affirm.

¶38. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**