# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-01017-SCT

*JATAVIS WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/26/2022 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | AMANDA HOPE MEADOWS |
| | BENJAMIN DAVID LANG |
| | SCOTT WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER N. AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE E. KOONCE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/08/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Jatavis Williams was indicted on one count of first-degree murder. He proceeded to trial, the jury found him guilty as charged, and he was sentenced to life imprisonment. He challenges his conviction on appeal as being against the overwhelming weight of the evidence. He also argues that the trial court erred by denying his request for a mistrial. We affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

## A. Procedural History

¶2. A Lowndes County grand jury indicted Jatavis Williams for one count of first-degree murder in violation of Mississippi Code Section 97-3-19 (Rev. 2020). A jury trial commenced on August 22, 2022, until August 26, 2022. The jury found Williams guilty as charged. Williams was sentenced to life imprisonment. After trial, Williams filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied. He timely appealed.

## B. Factual Background

¶3. On November 9, 2020, Sergeant Roman Sone received a dispatch about a shooting at the intersection of 22nd Street and 7th Avenue North in Columbus, Mississippi. When he responded to that dispatch, Sergeant Sone observed an unresponsive black male, lying on his side with blood on his back and front. Investigators identified the victim as Tacari Walker. While awaiting emergency medical services, Sergeant Sone and Detective Darnell Madison performed chest compressions on Tacari. Sergeant Sone testified that he did not find a weapon near Tacari's body. The Columbus Forensics Lab was called to the scene, and police officers turned the scene over to them for evidence processing.

¶4. Police received a Crime Stoppers' tip that the shooter was a black male with dreadlocks. Investigator Eric Lewis, one of the investigators present on the scene, was familiar with Jatavis Williams and knew he was a black male with dreadlocks. Earlier, while on the scene, Investigator Lewis had spoken to Tacari's girlfriend, LaKevia Isaac, who stated that Tacari had been arguing with Williams earlier that day. An officer went to Williams's

2

mother's house to try to find him, to no avail. In effort to locate him, law enforcement put Williams's name on the local news. Williams turned himself in to police the next day.

¶5. Investigator Lewis also spoke with Colando Smith, a friend of Tacari's, who was on the phone with Tacari at the time of the shooting. Colando told Lewis that Tacari and Williams had engaged in multiple arguments in the days leading up to the shooting.

¶6. The jury heard testimony from multiple witnesses, including Jatavis Williams. Several variations of the incident were presented to the jury, but the following two versions encapsulate the gist of the stories.

¶7. A few years after the shooting, Monica Hudgens—an eyewitness—gave an official statement to the police about what she observed. Monica, a longtime friend of LaKevia's, was driving by LaKevia's house when the shooting happened. Hudgens knew Tacari through LaKevia. Monica testified that she was in the passenger seat of her boyfriend's car when they were stopped by a train not far from LaKevia's house. Monica noticed that a brown truck two cars ahead of them turned around after the train had still not passed. She told the jury that as the truck passed, she noticed that the man driving looked angry, "like he was mad at something." She saw his face clearly and noticed that he had dreadlocks. Monica's boyfriend also turned their car around to avoid the train. She then saw that the brown truck "was right back in the lane" stopped next to LaKevia's house. Monica testified that she saw Tacari walk out of LaKevia's house talking on his cell phone. Tacari threw his hand up to say "hey" to Hudgens. Monica's boyfriend stopped the car, and she turned around and watched as Tacari approached the brown truck.

3

¶8.     Before Tacari got to the truck, Williams opened his car door and shot Tacari. Monica told the jury that Tacari looked shocked and slowly ran back toward LaKevia's house. Monica saw the brown truck "stopped there for a minute" before it slowly drove off. Monica only saw Tacari holding a cell phone; she did not see a gun. Monica described Tacari as happy and smiling when she saw him come from LaKevia's house. She also testified that Tacari was not holding the waistband of his pants at the time of the shooting.

¶9.     Williams took the stand and testified as to his version of the events. He testified that he saw Tacari pop pills—which Tacari called "beans"—on Wednesday through Saturday before the incident occurred on Monday. Williams testified that on the night before the shooting, Tacari called him upset and then came to pick Williams up. Tacari told Williams they were going to LaKevia's house because she had just shot at him; Tacari then asked Williams for a gun, and Williams gave him a gun. Williams testified that Tacari drove to LaKevia's house, fired the gun five times into the air in front of her house, then sped away. Williams testified that Tacari's behavior was not normal, and he had never seen Tacari just pull out a gun and start shooting.

¶10.    After the men left LaKevia's house, Tacari took Williams home and gave the gun back. Williams testified that he awoke the next morning to two missed calls from Tacari from around 6:00 a.m., which he found unusual. Williams called Tacari back, and Tacari told him to come to LaKevia's house. Williams testified that he drove to LaKevia's house with no reason to think Tacari was angry.

4

¶11. When Williams got to LaKevia's house, he saw texts from Tacari threatening to kill him and Williams's mother. According to Williams, Tacari ran outside of LaKevia's house in boxers with her pink gun, with which Williams was familiar. Tacari came to the edge of the gate and pointed the gun in the car with what Williams described as his "eyes bucked; all out of control." Tacari was screaming and cursing, threatening to kill Williams. Williams testified that Tacari tried to put a bullet in the chamber but fumbled the gun. Williams then drove away as a neighbor was telling him and Tacari to get away from their house.

¶12. Williams testified that he did not go to LaKevia's house with the intent to fight Tacari. He testified that Tacari had never pulled a gun on him or threatened to kill him. He told the jury that, on that day, he was scared of Tacari. Williams stated that he drove away from LaKevia's house and got stopped by a train. Williams then texted Tacari and told him to get his own gun, letting Tacari know that he was not going to have any more dealings with him. Tacari responded and said, "I'll take your gun. Where you at? Pull up now."

¶13. Williams then saw Tacari approaching his vehicle. Williams acknowledged that he saw a phone in one of Tacari's hands as he approached the vehicle. Williams explained that Tacari was "speed walking" toward his vehicle with his "eyes all bucked, like he [was] angry," and Tacari had his hands by his waistband, which meant to Williams that he had a gun. Williams said that he had previously seen Tacari keep a gun in his waistband. Tacari then approached Williams's vehicle; Williams shot him once in the chest, and Tacari ran back to LaKevia's front porch, where he died from the gunshot wound.

5

¶14. Colando Smith was on the phone with Tacari when he was shot. During that conversation, Colando testified that he suddenly heard a gunshot and heard Tacari say, "ain't no way" before he fell silent.

¶15. Williams testified that, after Tacari ran back to LaKevia's, he drove away to a friend's house in disbelief that he had killed Tacari. Williams told the jury that he was afraid when he shot Tacari, and he felt the only choice he had was "either him or me." Williams agreed that he did not accidentally shoot Tacari; he testified, "I shot him to protect myself."

## DISCUSSION

¶16. On appeal, Williams raises two issues for this Court's review. First, he argues the trial court erred by denying his request for a mistrial due to two separate instances of trial disruption. Williams asserts that "these extraneous, improper influences compromised the integrity of the proceedings" and the guarantee of his right to a fundamentally fair trial. He requests for this Court to reverse and remand for a new trial.

¶17. Second, Williams avers that the jury's verdict was against the overwhelming weight of the evidence. In his view, the evidence established that Williams acted in necessary self-defense or in imperfect self-defense. He requests for this Court to reverse his conviction and sentence and remand for a new trial.

¶18. The standards of review differ for these two issues and will be addressed accordingly.

### I. *The trial court did not err by denying the request for a mistrial.*

#### A. *First Instance—Victim's Mother*

6

¶19. The first instance that disrupted the trial proceedings was an outburst from Tacari's mother during Officer Sone's testimony. During the investigation, Officer Sone was wearing a body camera, and the State introduced his body-camera footage as an exhibit during trial.[1] As Sone's body-camera footage played in open court, Tacari's mother began wailing and crying, and as she exited the courtroom, she yelled, "Why did you do it, Jay? Why did you do it?" The trial court excused the jury, and defense counsel moved for a mistrial based on the disruption.

¶20. The trial court polled the jury to determine how many of them heard Tacari's mother wailing and crying and how many heard her statements. All jurors indicated that they heard Tacari's mother crying, but only four jurors indicated they heard her statements. The trial court asked the jurors if the outburst would influence their ability to decide the case and to be fair to both sides, and no juror answered in the affirmative. The trial court concluded the matter by expressing his confidence that Williams could continue to receive a fair trial:

> And the court has had a chance to observe the jurors. And the court gave the jurors the chance to—without pressure of any family members in the courtroom or anything like that, to indicate that they—that what they've heard unfairly prejudiced them and they can't set it aside.
>
> Each one of them has indicated that they can set it aside. The court has also instructed the jury. And they will get that written instruction also, that they're not to base their verdict on bias, sympathy, passion, or prejudice. So, they've indicated that they will follow that instruction. And the court will take them at their word.

---

[1] Sone's body-camera footage showed two females in the house; Sone testified that the females came outside of the house while he was there, and he admitted that he did not know whether the females were outside around Tacari's body before he arrived.

7

¶21.    The trial court then denied the motion for mistrial.  After a brief recess for the parties to instruct the families against further disruptions, the trial court warned the courtroom, "[i]f there's one more outburst of crying and stuff, then this case is over with.  I'll have to grant a mistrial. Does everybody understand that?"

### B.    Second Instance—Pornography in Court

¶22.    The second instance that disrupted the trial proceedings was a technological error during Dr. David Arboe's[2] testimony that was being conducted via Zoom.  During Dr. Arboe's voir dire qualification examination, the computer screen switched from the witness to a video of a partially nude woman having her breasts groped by a man.  This played for about thirty seconds before the video was turned off and the jury exited the courtroom.  Someone in the audience exclaimed, "I've never seen nothing like that in my life."

¶23.    The trial court recounted that "there was a woman on the screen who was naked from the waist up.  And then there was someone behind her and beside her who was grabbing her breasts.  And right before the thing went off, it showed a man.  There was a man—it became obvious, that it was a man that was grabbing her breast."

¶24.    After the jury was excused, Williams questioned the trial court on the impact that this might have on the jury and "whether or not a mistrial is warranted."  The trial court again polled the jury.  He explained that "nobody involved in the trial of this matter had anything

---

[2]Dr. David Arboe testified as an expert in the field of forensic psychology.  Dr. Arboe testified that Tacari sustained a gunshot wound that entered the left chest, passed through the left lung and heart, and exited the left back.  He determined that Tacari's cause of death was a gunshot wound to the chest and that the manner of death was homicide.  Dr. Arboe also testified that Tacari's toxicology report revealed that he had methamphetamine and marijuana in his system.

to do with any of that." All the jurors indicated they could set aside the inappropriate video content they saw during Dr. Arboe's testimony and "base their verdict only on the evidence that [they] see from the witness stand." Dr. Arboe's examination continued without further interruption.

### C. Analysis

¶25. "The standard of review for the denial of a mistrial is abuse of discretion." *Flora v. State*, 925 So. 2d 797, 804 (Miss. 2006) (citing *Spann v. State*, 771 So. 2d 883, 889 (Miss. 2000)). "A trial court 'must declare a mistrial when there is an error in the proceedings resulting in *substantial and irreparable prejudice* to the defendant's case.'" *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010) (emphasis added) (quoting *Parks v. State*, 930 So. 2d 383, 386 (Miss. 2006)). "Upon motion of a party or its own motion, the court may declare a mistrial if . . . [t]he trial cannot proceed in conformity with the law[.]" Miss. R. Crim. P. 23.5(a).

¶26. This Court has instructed that, "[a]s long as an audience does not disturb or prevent a fair trial, we cannot control the lower court in its discretion, and tell it when to exercise authority and when not. It is only when it is evident that such authority should be exercised that this Court will interfere." *Madere v. State*, 794 So. 2d 200, 214 (Miss. 2001) (quoting *Floyd v. State*, 148 So. 226, 232 (1933)). "[A] mistrial is reserved for those few instances where *the court can take no action which would sufficiently cure improper occurrences inside (or outside) the courtroom*." *Walker v. State*, 671 So. 2d 581, 621 (Miss. 1995) (emphasis added). Further, "[u]nusual occurrences sometimes happen at trial. This truth is

9

known well by all who practice in our courtrooms." *Scott v. State*, 347 So. 3d 1173, 1175 (Miss. 2022).

¶27.    Williams argues that the trial court erred by failing to declare a mistrial in this matter because of the multiple disruptions to the proceedings.  He argues that Tacari's mother's outburst and the pornography cast on the screen during the Zoom testimony compromised the integrity of the trial.  According to him, these occurrences were extraneous improper influences that compromised his right to a fundamentally fair trial and were beyond the corrective action of the court.

¶28.    The State argues that the trial court did not err by denying Williams's motion for mistrial based on the victim's mother's outburst.  Mistrials should only be granted in exceptional circumstances, and according to the State, this outburst did not constitute such an exceptional circumstance.  The State asserts that the trial court did not err by denying a mistrial based on the inappropriate, but unrelated, video content that was played during the Zoom testimony.  Even though the pornographic video presented an unusual circumstance that the trial judge had never before encountered, the judge assured the jury that neither party, nor the testifying witness, had anything to do with the video.  After this second interruption, the trial judge earnestly questioned the jury about their ability to move forward in a fair manner and their ability to consider only the evidence presented by the parties.  The State claims this is not one of those rare instances in which the judge could not cure the improper occurrence and maintain a fair trial.  *See Walker*, 671 So. 2d at 621 ( "The settled rule in this

state is that a mistrial is reserved for those few instances where the court can take no action which would sufficiently cure improper occurrences inside (or outside) the courtroom.")

¶29.    We agree with the State that the trial judge did not abuse his discretion by refusing to grant a mistrial based on the two instances of disruption in this case. This Court dealt with a similar situation to the first instance (Tacari's mother's outburst) in *Bell v. State*, 631 So. 2d 817 (Miss. 1994). In *Bell*, the victim's mother leapt up from her seat in the courtroom and yelled, "cold blooded killed my child" during the testimony of one of the witnesses. *Id.* at 819 (internal quotation marks omitted). The victim's mother was so disruptive that she had to be "restrained and forcibly taken out of the courtroom." *Id.* at 819–20. After the jury was excused, Bell requested a mistrial. *Id.* On appeal, this Court upheld the trial court's decision to deny Bell's request for a mistrial. *Id.*

¶30.    Here, the trial court did not abuse his discretion because he was able to cure the disruption. When Tacari's mother began to audibly cry, the trial judge asked that the jury be dismissed. Only four of the jurors indicated they had heard Tacari's mother's statements while the jury was leaving the courtroom. Although this unfortunate event occurred, the trial judge polled the jury to see if they could set aside the event and continue. All jurors indicated they could continue the trial and not consider the outburst during deliberations.

¶31.    The jury was not prejudiced by the sexually explicit video that was played during Dr. Arboe's testimony. The trial court made evident to the jury that neither party involved in the proceedings was responsible for the video. The judge again sent the jury out, discussed the matter with counsel, and then polled the jury. The jury members indicated that they could

11

continue and that they were able to disregard the disturbance. This Court's opinion in *Walker* makes clear that a mistrial can only be granted when there is *no action* to cure the improper occurrence. *Walker*, 671 So. 2d at 621. This is clearly not one of those instances, as the trial court was able to mitigate the disruptions, took corrective action, and ensured the proceedings could move forward in a civil and fair manner. Therefore, the trial court did not abuse its discretion by denying the motion for a mistrial. We affirm as to this issue.

> ## II.     *The jury's verdict was not against the overwhelming weight of the evidence.*

¶32.

> When reviewing a challenge to the weight of the evidence, all evidence should be weighed in the light most favorable to the verdict, and the conviction should not be overturned unless it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. When reviewing the jury verdict, all inferences must be drawn in favor of the State.

*Anderson v. State*, 361 So. 3d 609, 618 (Miss. 2023) (citations omitted).

¶33.    "Issues of fact and credibility are the primary responsibility of the trier of fact. Accordingly, this Court should not reweigh the facts nor substitute its judgment for that of the fact finder as to credibility issues." *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 152 (Miss. 1999). "Any conflicts in the evidence are for the jury to resolve." *Clements v. State*, 237 So. 3d 175, 183 (Miss. Ct. App. 2017) (citing *Williams v. State*, 64 So. 3d 1029, 1033 (Miss. Ct. App. 2011)).

¶34.    For self-defense, a killing is justifiable "[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to

apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished[.]" Miss. Code Ann. § 97-3-15(1)(f) (Rev. 2020). Imperfect self-defense occurs when the defendant "killed the deceased without malice, under the bona fide belief, but without reasonable cause therefor, that it was necessary for him so to do in order to prevent the appellant from inflicting death or great bodily harm upon him[.]" *Lanier v. State*, 684 So. 2d 93, 97 (Miss. 1996) (quoting *Cook v. State*, 467 So. 2d 203, 207 (Miss. 1985)). Importantly, however, deliberate design to kill a person may be formed very quickly, even only moments before the act of consummating the intent. *Holliman v. State*, 178 So. 3d 689, 698 (Miss. 2015). "It is well-established that '[m]alice, or deliberate design, may be inferred from the use of a deadly weapon.'" *Id.* (alteration in original).

¶35. Williams argues that the verdict was against the overwhelming weight of the evidence because, he alleges, the evidence established that he shot Tacari in either necessary self-defense or imperfect self-defense.

¶36. Williams directs the Court to *Miller v. State*, in which this Court held that "[a] killing with a deadly weapon may be susceptible of clear explanation by the accused or eyewitnesses as an *accident* or justified as having been committed by the accused acting in lawful self-defense, or mitigated manslaughter." *Miller v. State*, 677 So. 2d 726, 731 (Miss. 1996) (quoting *Nicolaou v. State*, 534 So.2d 168 (Miss. 1988)). He posits that he shot Tacari because he quickly approached Williams's vehicle holding his waistband, he had invited

Williams over in an effort to start an altercation, and Williams was scared of Tacari after his recent erratic behavior.

¶37. The State argues that Williams's conviction was not against the overwhelming weight of the evidence. Although Williams says that he shot Tacari in self-defense and that the jury erred when they convicted him of first-degree murder, Mississippi caselaw is abundantly clear that the jury determines the witnesses' credibility and whether they believe the defendant's version of events. The State argues that, in this case, the jury chose not to believe Williams's testimony and that this does not entitle him to a new trial. We agree.

¶38. Here, Williams claims that he pulled the trigger instantly—without any aforethought—when Tacari was approaching his vehicle because he feared for his life. The evidence, however, shows that Tacari had not yet reached Williams's vehicle when he was shot nor had there been any physical altercation between the two in the moments leading up to the shooting. Further, no words were exchanged between them immediately before the shooting.

¶39. Williams told the jury that he left LaKevia's house because he thought Tacari possessed a gun. But other witnesses testified that Tacari was unarmed in the moments leading up to Williams arriving and during his interactions with Williams that morning. LaKevia testified that, on the morning of the shooting, Tacari seemed happy and normal. Only Williams claimed that Tacari was armed.

¶40. Williams's claim of self-defense is inapt. "The issue of justifiable self-defense presents a question of the weight and credibility of the evidence, rather than sufficiency, and

is to be determined by the jury." ***Jones v. State***, 39 So. 3d 860, 865 (Miss. 2010) (citing ***Wade v. State***, 748 So. 2d 771, 775 (Miss. 1999)). "[A]ny factual disputes are properly resolved by the jury and do not mandate a new trial." ***Id.*** (internal quotation marks omitted) (quoting ***McNeal v. State***, 617 So. 2d 999, 1009 (Miss. 1993)). "The Court presumes that the jury considered all of the evidence and theories of defense and concluded that [the defendant] did not act out of 'necessary self[-]defense.'" ***Flynt v. State***, 183 So. 3d 1, 11 (Miss. 2015).

¶41.    The jury was properly instructed on the law of self-defense and imperfect self-defense and rejected those theories. The jury heard testimony from multiple witnesses, including Williams himself, and properly weighed the witnesses' credibility. This Court must give deference to the jury's credibility determination, and in this case, Williams's conviction is not against the overwhelming weight of the evidence. Thus, a new trial is not warranted. We affirm.

¶42.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**

15